**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

PAUL GABRIEL MORALES HEREDIA,
AKA Alejandro Montada Heredia,
AKA Alejandro Montada, AKA Paul
Gabriel Morales, AKA Paul Heredia
Morales,

*Defendant-Appellant*.

No. 12-50331

D.C. No.
8:12-cr-00006-
SVW-1

OPINION

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted
May 15, 2014—Pasadena, California

Filed October 8, 2014

Before: Alex Kozinski, Chief Judge, and Kim McLane
Wardlaw and Raymond C. Fisher, Circuit Judges.

Opinion by Judge Wardlaw

## SUMMARY[*]

### Criminal Law

The panel vacated a sentence for illegal reentry in violation of 8 U.S.C. § 1326, and remanded for resentencing, in a case in which the defendant and the government executed a fast-track plea agreement under Fed. R. Crim. P. 11(c)(1)(C).

The panel held that the government breached the plea agreement through its repeated and inflammatory references to the defendant's criminal history in its sentencing memorandum, serving no practical purpose but to argue implicitly for a higher punishment than it had agreed to recommend.  The panel held that the government also breached the plea agreement by violating its promise not to suggest in any way that the district court impose a sentence other than the stipulated one.

The panel explained that when a defendant timely objects, moves for specific performance, and successfully appeals the district court's post-breach order rejecting a Rule 11(c)(1)(C) plea agreement, the appropriate remedy is to vacate the conviction and sentence and remand for further proceedings before a different judge.  Because the defendant appealed only his sentence and did not seek vacatur of his conviction, the panel vacated only his sentence and remanded for resentencing before a different district judge.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Sean K. Kennedy, Federal Public Defender, Jonathan D. Libby (argued), Deputy Federal Public Defender, Los Angeles, California, for Defendant-Appellant.

André Birotte Jr., United States Attorney, Robert E. Dugdale, Assistant United States Attorney, Chief, Criminal Division, L. Ashley Aull (argued), Assistant United States Attorney, Nathaniel B. Walker, Special Assistant United States Attorney, Los Angeles, California, for Plaintiff-Appellee.

**OPINION**

WARDLAW, Circuit Judge:

Every day along the southwest border, previously deported aliens lacking entry documents are arrested, detained, and charged with illegal reentry. Once convicted, they serve a term of imprisonment, and then are again deported. The numbers are so great that federal prosecutors in these border states began to resort to an efficient means of securing a conviction: a "fast-track" plea agreement that binds the government and the defendant, but not the district judge.

The government secures the benefit of a streamlined process that minimizes the burden on its prosecutorial resources. It need not go before a grand jury to secure an indictment; battle motions, including collateral attacks on the underlying deportation; prosecute a jury trial; or oppose an appeal. The defendant, in turn, waives constitutional and other rights and agrees to a term of incarceration and, often,

a term of supervised release ordinarily discouraged by the U.S. Sentencing Guidelines.  What is the incentive for the defendant to take this deal?  The prosecutor binds his office to recommend a four-level downward departure in the offense level now advised by the Guidelines, and to present a "united front" in favor of a reduced sentence to the district judge.  If the judge does not accept this sentence, the defendant may walk away from his guilty plea, and proceedings will begin anew.

Paul Gabriel Morales Heredia (Morales) was one such defendant.  But in Morales's case, the orderly and efficient plea-bargaining process did not play out as intended.  The government extended the promise of a reduced prison term with one hand and took it away with the other.  The prosecutor's recommendation of a six-month prison term rang hollow as he repeatedly and unnecessarily emphasized Morales's criminal history, adding for good measure his personal opinion that "defendant's history communicates a consistent disregard for both the criminal and immigration laws of the United States."  Morales's counsel timely objected and sought specific performance of the plea agreement.  The district judge denied this relief on the irrelevant ground that the prosecutor's statements did not influence him.  We conclude that Morales is entitled to relief, and we vacate his sentence and remand for further proceedings before a different judge.

## I.

The Immigration and Nationality Act of 1952 imposed felony criminal liability for a previously deported alien who subsequently entered, attempted to enter, or was found in the United States.  *See* Pub. L. 82-414, § 276, 66 Stat. 163, 229

(1952) (codified as amended at 8 U.S.C. § 1326). For several decades thereafter, this provision—like the immigration laws as a whole—was lightly enforced along the southwest border. Aliens were seldom charged with illegal reentry under § 1326. A few were charged with misdemeanor improper entry, 8 U.S.C. § 1325, and most were simply deported without criminal sanctions.[1]  In 1992, out of more than 565,000 undocumented aliens apprehended in the Southern District of California, only 245 were charged with a felony of any kind, and many of those charges arose from conduct other than the unlawful entry itself.[2]

In the mid-1990s, the federal government increased its enforcement of the immigration laws in the southwest, rapidly expanding the resources available to the Border Patrol.[3]  Since then, the United States has prosecuted increasing numbers of aliens for illegal reentry under § 1326 and improper entry under § 1325. In 1993, the Department of Justice initiated fewer than 2,500 illegal reentry prosecutions.[4] By 2004, that number had grown to more than

---

[1] *See* Alan D. Bersin, *Reinventing Immigration Law Enforcement in the Southern District of California*, 8 FED. SENT'G REP. 254, 254–55 (1996).

[2] *See* William Braniff, *Local Discretion, Prosecutorial Choices and the Sentencing Guidelines*, 5 FED. SENT'G REP. 309, 309 (1993).

[3] *See generally* U.S. GEN. ACCOUNTING OFFICE, GAO-01-842, INS' SOUTHWEST BORDER STRATEGY: RESOURCE AND IMPACT ISSUES REMAIN AFTER SEVEN YEARS (2001).

[4] *See At Nearly 100,000, Immigration Prosecutions Reach All-Time High in FY 2013*, TRANSACTIONAL RECORDS ACCESS CLEARINGHOUSE (Nov. 25, 2013), http://trac.syr.edu/immigration/reports/336.

13,000.[5]     In each of the past five years, the federal government has initiated over 30,000 illegal reentry prosecutions, including an all-time high of 37,440 last year.[6] These prosecutions constitute a significant proportion of the federal criminal docket.  More than a third of all federal defendants in the Ninth Circuit are charged with immigration offenses.[7]

Fast-track plea programs are both a response to and a cause of this rise in prosecutions.  In 1993, the United States Attorney's Office for the Southern District of California began to offer accelerated plea deals to defendants charged with illegal reentry under 8 U.S.C. § 1326(b), who faced increased sentencing exposure because their previous removal had occurred subsequent to a felony conviction. *See United States v. Estrada-Plata*, 57 F.3d 757, 759 (9th Cir. 1995). Defendants were required to waive indictment, plead guilty at the initial appearance, waive appeal of their sentence, and stipulate to a two-year sentence, below the applicable range

---

[5] *See Changes in Criminal Enforcement of Immigration Laws*, TRANSACTIONAL RECORDS ACCESS CLEARINGHOUSE (May 13, 2014), http://trac.syr.edu/immigration/reports/354.

[6] *Id.*  While the number of § 1326 charges has increased in rough parallel with the number of § 1325 charges, the number of § 1326 convictions has started to decline as defendants increasingly resolve their cases by pleading to misdemeanors. *See Despite Rise in Felony Charges, Most Immigration Convictions Remain Misdemeanors*, TRANSACTIONAL RECORDS ACCESS CLEARINGHOUSE (June 26, 2014), http://trac.syr.edu/immigration/reports/356.  In the District of Arizona, in particular, almost 90 percent of defendants initially charged under § 1326 are eventually convicted under § 1325. *See id.*

[7] *See* UNITED STATES COURTS FOR THE NINTH CIRCUIT, 2012 ANNUAL REPORT 65 (2012).

of the then-binding Guidelines. *See id.* In 1995, the same United States Attorney's Office began to offer fast-track pleas to all illegal reentry defendants with substantial criminal histories, requiring defendants to plead guilty under § 1326(a) and to stipulate to the entry of an order of removal that would result in their deportation immediately upon their release from prison.[8] Making widespread use of fast-track pleas, the Southern District of California prosecuted more felony immigration offenses in 1995 than it had in the previous ten years combined.[9] In other border districts where the federal government had committed additional resources to enforcement, fast-track programs also emerged, and prosecutions rapidly increased.[10]

In 2003, Congress endorsed fast-track pleas by directing the United States Sentencing Commission to promulgate a policy statement authorizing reduced sentences for participants in fast-track programs. *See* Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today (PROTECT) Act of 2003, Pub. L. No. 108-21, § 401(m)(2)(B), 117 Stat. 650, 675 (2003). The Sentencing Guidelines now permit the district court to adjust the offense level of a defendant who participates in a fast-track program not more than four levels downward. *See* U.S.S.G. § 5K3.1. The courts of appeals eventually split over whether a district court could impose a below-Guidelines sentence for a defendant in a district without a fast-track

---

[8] *See* Bersin, *supra* note 1, at 256.

[9] *See id.*

[10] *See id.* at 258 n.1; *see also* Thomas E. Gorman, *A History of Fast-Track Sentencing*, 21 FED. SENT'G REP. 311, 311 (2009).

program on the basis of an unwarranted sentencing disparity with a fast-track defendant who had committed the same offense. *Compare, e.g.*, *United States v. Gonzalez-Zotelo*, 556 F.3d 736, 739–40 (9th Cir. 2009), *with United States v. Rodriguez*, 527 F.3d 221, 227–29 (1st Cir. 2008). The Department of Justice responded in 2012 by establishing uniform eligibility requirements for fast-track pleas for all defendants across the country. *See* Memorandum for All United States Attorneys from James M. Cole, Deputy Attorney General, at 2 (Jan. 31, 2012) [hereinafter "Cole Memorandum"], *available at* http://www.justice.gov/dag/fast-track-program.pdf.

While the details may vary from district to district, all fast-track programs "are based on the premise that a defendant who promptly agrees to participate in such a program saves the government significant and scarce resources that can be used to prosecute other defendants, and . . . has demonstrated an acceptance of responsibility above and beyond what is already taken into account by the adjustments contained in the Sentencing Guidelines." *Id.* at 1. According to the Department of Justice, fast-track plea agreements have become an important nationwide tool to address the "compelling, and otherwise potentially intractable, resource issue" posed by the number of immigration crimes on the federal criminal docket.[11] *Id.*

---

[11] The government has also responded to these resource challenges by appointing Special Assistant United States Attorneys to handle criminal prosecutions. These attorneys may be on loan from other government agencies, or may be unpaid volunteers. *See* Joe Davidson, *'Special' Assistant United States Attorneys Work for Free*, WASH. POST, July 18, 2013.

Because the object of a fast-track plea is to achieve greater than normal efficiency through a lighter than normal sentence, the parties in a fast-track case typically encourage the district court to impose the negotiated sentence. Federal Rule of Criminal Procedure 11 provides them with the means to do so. Rule 11 governs the process for entering pleas and sets forth requirements for the district court's acceptance of a guilty plea. *See* Fed. R. Crim. P. 11(a), (b). It also recognizes three distinct types of plea agreements. *See* Fed. R. Crim. P. 11(c)(1). The government may agree to dismiss or not to bring further charges; to make a sentencing recommendation that does not bind the district court; or to make a sentencing recommendation that binds the district court if the court accepts the agreement. *Id.*

Specifically, Rule 11(c)(1)(C) authorizes the government to "agree that a specific sentence or sentencing range is the appropriate disposition of the case, or that a particular provision of the Sentencing Guidelines . . . or sentencing factor does or does not apply." The agreement "is contingent until the court accepts" it. *Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011) (plurality opinion). When presented with a Rule 11(c)(1)(C) agreement, the district court may accept the agreement, reject the agreement, or wait to consider the agreement until it has reviewed the presentence report. *See* Fed. R. Crim. P. 11(c)(3). If the district court ultimately accepts the agreement, it must impose the recommended sentence. *See* Fed. R. Crim. P. 11(c)(4). If it ultimately rejects the agreement, it must give the defendant

the opportunity to withdraw his plea. *See* Fed. R. Crim. P. 11(c)(5).[12]

While Rule 11(c)(1)(C) may apply to any offense, it plays a particularly important role in fast-track illegal reentry cases. The Department of Justice requires that United States Attorneys retain the discretion to compel defendants who wish to participate in fast-track programs to enter into Rule 11(c)(1)(C) agreements. *See* Cole Memorandum at 4. In some judicial districts, fast-track defendants are in fact required to enter into Rule 11(c)(1)(C) agreements.[13] In 2006, the Central District of California began to offer a Rule 11(c)(1)(C) agreement as its standard fast-track plea offer to

---

[12] Sentence bargains are a longstanding, though controversial, practice. *See* Joshua D. Asher, Note, *Unbinding the Bound: Reframing the Availability of Sentence Modifications for Offenders Who Entered Into 11(c)(1)(C) Plea Agreements*, 111 COLUM. L. REV. 1004, 1005–06, 1021–23 & n.90 (2011). One district judge has described Rule 11(c)(1)(C) pleas as "the best tool between the extremes of no prosecution at all and an effort to obtain the most severe sentence available under the law and the Guidelines." John Gleeson, *The Sentencing Commission and Prosecutorial Discretion: The Role of the Courts in Policing Sentence Bargains*, 36 HOFSTRA L. REV. 639, 641 (2008). But Rule 11(c)(1)(C), like other procedural provisions that allocate power to prosecutors to determine sentences, also raises the concern that "the prosecutor becomes the adjudicator—making the relevant factual findings, applying the law to the facts, and selecting the sentence or at least the sentencing range." Rachel E. Barkow, *Institutional Design and the Policing of Prosecutors: Lessons from Administrative Law*, 61 STAN. L. REV. 869, 878 (2009).

[13] *See Fast-Track Policies for Illegal Reentry Cases by District and Circuit*, DEFENDER SERVICES OFFICE (Dec. 2013), http://www.fd.org/docs/select-topics/sentencing-resources/fast-track-policies-for-illegal-reentry-cases-by-district-and-circuit-%28december-2013%29.pdf?sfvrsn=4.

most defendants charged with illegal reentry.**[14]**  As far as we are aware, this policy remains in effect.  In the Central District and throughout the Ninth Circuit, Rule 11(c)(1)(C) agreements are a common way of resolving illegal reentry prosecutions.  *See, e.g.*, *United States v. Gonzalez*, 502 F. App'x 665 (9th Cir. 2012); *United States v. Soto-Lopez*, 475 F. App'x 144 (9th Cir. 2012); *United States v. Martinez*, 357 F. App'x 100 (9th Cir. 2009); *United States v. Cruz-Gramajo*, 570 F.3d 1162, 1166–67 (9th Cir. 2009).

## II.

Within this larger context, enter (or, reenter) Morales. Like so many others, Morales, a native and citizen of Mexico, has repeatedly crossed the southwest border into the United States without authorization.  After being removed from the United States in 1992, 2009, and 2010, he again entered without inspection in 2011.  Immigration authorities apprehended him.  The government charged Morales in an information with illegal reentry, in violation of 8 U.S.C. § 1326.  The government also provided notice that one of Morales's prior removals had occurred subsequent to an aggravated felony conviction, thereby increasing the statutory maximum penalty from two years' imprisonment to twenty years' imprisonment.  *See* 8 U.S.C. § 1326(b)(2).

In January 2012, Morales and the government executed a written fast-track plea agreement under Rule 11(c)(1)(C). Morales agreed to plead guilty to the sole count of illegal reentry in the information at the earliest opportunity provided

---

**[14]** *See Memorandum Reporting Revisions to Illegal Reentry Fast-Track Program in Central District of California*, 21 FED. SENT'G REP. 349, 350 (2009).

by the government. He agreed to waive his constitutional rights to be indicted by a grand jury, to contest his guilt at trial, to confront adverse witnesses, to testify on his own behalf, and to avoid self-incrimination. Morales also promised not to pursue any affirmative defenses, to seek the suppression of evidence under the Fourth or Fifth Amendments, or to pursue any other pretrial motions. Finally, he agreed to waive his right to appeal his conviction. Morales acknowledged that his conviction might subject him to deportation.

In return, the United States promised to recommend a particular sentence that would bind the district court unless it rejected the agreement. The parties agreed on the applicable provisions of the United States Sentencing Guidelines. They also agreed that Morales's total offense level under the Guidelines was nine. This included the four-level reduction advised by the Guidelines for participation in a fast-track program. *See* U.S.S.G. § 5K3.1. The parties agreed that the probation office could prepare a presentence report (PSR) that addressed only Morales's criminal history, and that no further factual development of the record was required. The parties acknowledged that the district court would calculate Morales's criminal history category. The intersection of the criminal history category with Morales's stipulated total offense level would determine his sentencing range under the Guidelines. *See* U.S.S.G. ch. 5, pt. A.

Morales and the United States agreed that the appropriate disposition of the case was a prison term equal to the low end of the applicable Guidelines range, plus the statutory maximum of three years of supervised release, *see* 18 U.S.C. § 3583(b)(2). They did so despite the provision of the Sentencing Guidelines advising against supervised release in

cases involving aliens who, like Morales, would likely be deported after incarceration. *See* U.S.S.G. § 5D1.1(c). Morales acknowledged that the conditions of his supervised release would include compliance with the immigration laws of the United States.

Both parties agreed to recommend that the district court impose the stipulated sentence. They also agreed that they would not "seek, argue, or suggest in any way, either orally or in writing, that any other specific offense characteristics, adjustments, departures, or variances in sentence . . . be imposed, or that the Court impose a sentence other than what has been stipulated to by the parties herein." Both reserved the right to "supplement the facts" by supplying the court with relevant information, as well as the right to "correct any and all factual misstatements" relating to the district court's Guidelines calculations. If the district court imposed the stipulated sentence, both parties waived the right to appeal any part of the sentence except the court's calculation of Morales's criminal history category.

The district court provisionally accepted Morales's plea of guilty, while cautioning Morales that it reserved the right to reject the Rule 11(c)(1)(C) plea agreement and that, if it did so, Morales would have an opportunity to withdraw his plea. Several weeks later, Morales's probation officer disclosed his presentence report to the parties and the district court. The PSR detailed Morales's criminal history, which included felony convictions for burglary, receiving stolen property, and the sale of heroin, as well as a misdemeanor domestic violence conviction. The probation officer determined that Morales had three criminal history points, resulting in a criminal history category of II and, with the fast-track downward adjustment in offense level, an

applicable Guidelines range of six to twelve months in prison. The probation officer recommended that the district court impose the stipulated low-end sentence of six months' imprisonment plus three years of supervised release.

The government then filed its sentencing position in the district court. The government recommended a low-end sentence of six months' imprisonment and a three-year period of supervised release, as it had agreed to do. It then went on to detail "[d]efendant's 20-year criminal history" already identified in the PSR. Discussing Morales's 1993 conviction for possession of heroin for sale, the government noted that Morales had been "arrested with 56 balloons filled with over 9 grams of heroin." Addressing Morales's 1995 domestic violence conviction, the government explained that Morales "allegedly choked the mother of his then-infant daughter, grabbed her face, shook her vigorously, shoved her against a wall, and cut her lip." Morales's criminal history, the government argued, "communicates a consistent disregard for both the criminal and immigration laws of the United States."

Furthermore, though it argued that a six-month sentence was reasonable, the government also noted that "defendant's demonstrated propensity for drug trafficking and theft-related offenses is also concerning, and an appropriate sentence is warranted to ensure sufficient deterrence to future criminal conduct." And, to support the recommended term of supervised release, the government stated that Morales "poses a danger to the community because his criminal history includes both drug trafficking and battery."

Defense counsel promptly emailed the prosecutor to express his view that the government had breached the plea agreement by failing to recommend, in substance, a sentence

at the low end of the Guidelines range. Counsel urged the government to withdraw its sentencing position and file a new one. The prosecutor denied breaching the agreement. Shortly thereafter, the government filed a supplemental sentencing position without withdrawing the original. In its supplemental memorandum, the government corrected two technical errors and reiterated its support for a "low-end 6-month prison term" and a three-year period of supervised release. The government stated that it had "consistently advocated" for this sentence and that its prior memorandum had "analyze[d] defendant's criminal history because criminal history is a major component of any thorough [sentencing] analysis."

A few weeks later, the district court informed the parties that it would not accept the terms of the Rule 11(c)(1)(C) agreement and that Morales therefore had the right to withdraw his guilty plea. Defense counsel immediately moved for specific performance of the plea agreement, arguing that the government's initial sentencing memorandum had breached it. At a hearing on the motion, the district court expressed its view that Rule "11(c)(1)(C) is a different kind of plea agreement," and that it retained discretion to reject the agreement irrespective of the government's statements. Defense counsel argued that "the breach[] jurisprudence is no less applicable in the 11(c)(1)(C) context than it is in any other plea agreement context."

The district court denied Morales's motion for specific performance of the plea agreement in a written order. It explained: "The Government's brief description of Defendant's criminal history and prior immigration violations had no effect on this Court's rejection of the Rule 11(c)(1)(C) plea." Rather, it had determined that the stipulated sentence

was inadequate "on the basis of its independent review" of the PSR. The district court noted that "all of the cases cited by Defendant . . . did not involve[] a Rule 11(c)(1)(C) plea."[15]

Four days later, at the sentencing hearing, Morales declined to withdraw his guilty plea when given the opportunity to do so. The district court sentenced him to twenty-one months of incarceration—three-and-a-half times longer than the stipulated prison term—and three years of supervised release. The twenty-one month prison term was equal to the high end of the Guidelines range that would have applied without the four-level downward adjustment for a fast-track plea. Morales timely appealed.

## III.

We have jurisdiction to review Morales's sentence pursuant to 18 U.S.C. § 3742(a). Because Morales's counsel objected to the government's statements before the district court, we review *de novo* whether the government breached the plea agreement. *United States v. Whitney*, 673 F.3d 965, 970 (9th Cir. 2012).

## IV.

### A.

"[C]riminal justice today is for the most part a system of pleas, not a system of trials." *Lafler v. Cooper*, 132 S. Ct. 1376, 1388 (2012). In the vast majority of criminal cases, a

---

[15] We cannot discern from the record whether the district court found that there was no breach or that any breach was harmless. The difference is immaterial to our analysis, as either conclusion was error.

prosecutor's promise of less harsh treatment induces the defendant to waive his constitutional rights and admit guilt. Plea bargaining is desirable because it conserves resources, encourages prompt and final resolution of criminal cases, helps avoid the "corrosive impact" of prolonged pretrial detention, and abates the risk to public safety caused by lengthy pretrial release. *Santobello v. New York*, 404 U.S. 257, 260–61 (1971). "However, all of these considerations presuppose fairness" in the plea bargaining process. *Id.* at 261. Accordingly, when the prosecutor makes a promise to the defendant, that "promise must be fulfilled." *Id.* at 262. The integrity of the criminal justice system depends upon the government's strict compliance with the terms of the plea agreements into which it freely enters. *See Whitney*, 673 F.3d at 974.

Plea agreements are "essentially contracts." *Puckett v. United States*, 556 U.S. 129, 137 (2009). We enforce their literal terms, construing any ambiguities in the defendant's favor. *See United States v. Franco-Lopez*, 312 F.3d 984, 989 (9th Cir. 2002). In interpreting the agreement and crafting an appropriate remedy for any breach, our task is to "secure the benefits promised [the defendant] by the government in exchange for surrendering his right to trial." *Id*.

The government breaches its agreement with the defendant if it promises to recommend a particular disposition of the case, and then either fails to recommend that disposition or recommends a different one*. See, e.g.*, *United States v. Johnson*, 187 F.3d 1129, 1135 (9th Cir. 1999). *See generally* 5 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 21.2(d) (3d ed. 2013). When it offers to recommend a specific sentence, the government induces the defendant to forfeit his constitutional rights in exchange for

a "united front." *United States v. Camarillo-Tello*, 236 F.3d 1024, 1028 (9th Cir. 2001). "[W]hen the sentencing court hears that both sides believe a certain sentence is appropriate and reasonable in the circumstances, this is more persuasive than only the defendant arguing for that sentence. . . . [T]his 'united front' is the defendant's benefit of the bargain." *Id.*

The government's promise to recommend a particular disposition can be broken either explicitly or implicitly. *See Whitney*, 673 F.3d at 971. The government is under no obligation to make an agreed-upon recommendation "enthusiastically." *Johnson*, 187 F.3d at 1135. However, it may not superficially abide by its promise to recommend a particular sentence while also making statements that serve no practical purpose but to advocate for a harsher one. *See Whitney*, 673 F.3d at 971; *United States v. Mondragon*, 228 F.3d 978, 981 (9th Cir. 2000); *Johnson*, 187 F.3d at 1135. That is, the government breaches its bargain with the defendant if it purports to make the promised recommendation while "'winking' at the district court" to impliedly request a different outcome. *United States v. Has No Horses*, 261 F.3d 744, 750 (8th Cir. 2001). An implicit breach of the plea agreement occurs if, for example, the government agrees to recommend a sentence at the low end of the applicable Guidelines range, but then makes inflammatory comments about the defendant's past offenses that do not "provide the district judge with any new information or correct factual inaccuracies." *Whitney*, 673 F.3d at 971 (quoting *Mondragon*, 228 F.3d at 980).

## B.

As the district court observed, we have not previously applied the principles governing the breach of plea

agreements to Rule 11(c)(1)(C) agreements.**[16]**   The only logical conclusion, however, is that those principles apply with equal force in this context.  Our decisions in *Mondragon* and *Whitney* confirm that the government breached its agreement with Morales by denying him the united front for which he bargained.  The government's statements in this case did at least as much to recommend a harsher than agreed-upon sentence as the statements that breached the plea agreements in *Mondragon* and *Whitney*.

In *Mondragon*, the government promised the defendant that it would "make no recommendation regarding [the] sentence."   228 F.3d at 979.   After defense counsel characterized the defendant's previous crimes as "petty," the district court asked the government whether it had any comment.  *Id.*  The government pointed out in response that the defendant had frequently run from law enforcement, resisted arrest, and skipped court dates.  *See id.*  We rejected the government's argument that its comments served the legitimate purpose of responding to the court's question or correcting factual misstatements by opposing counsel.  *See id.* at 980.  Because the "prosecutor's comments did not provide the district judge with any new information or correct any factual inaccuracies," but simply repeated information already contained in the PSR, we concluded that "the comments could have been made for only one purpose: to

---

**[16]** In *United States v. Gonzalez-Aguilar*, 718 F.3d 1185 (9th Cir. 2013), we reviewed a similar alleged breach of a Rule 11(c)(1)(C) agreement for plain error.  We declined to decide whether the government had breached the agreement by including aggravating facts in its sentencing memorandum because we held that the defendant could not show any breach affected his substantial rights.  *Id.* at 1187.  Here, because defense counsel timely objected below, we address the questions left open in *Gonzalez-Aguilar*.

influence the district court to impose a harsher sentence." *Id.* By implicitly making a sentencing recommendation, the government breached the plea agreement. *Id.*

In *Whitney*, the government promised the defendant it would recommend a sentence at the low end of the applicable Guidelines range. *See Whitney*, 673 F.3d at 968. After defense counsel stated that the defendant was merely a nonviolent thief, and "not a good thief," the government responded to "rebut[]" the claim, arguing that the defendant was in fact a "good thief." *Id.* at 969–70. As in *Mondragon*, the prosecutor's comments provided no new factual information to the district court. *See id.* at 971. We rejected as "disingenuous" the government's argument that it was compelled to provide an argument to "justify even its low-end guideline sentence recommendation." *Id.* at 971–72. The district court had given no indication that it was considering imposing a sentence lower than the government's recommendation; the defendant could not have requested a below-Guidelines sentence under the terms of the plea agreement; and the probation office recommended a sentence more than double the low end of the Guidelines range. *See id.* at 972. We therefore concluded that the prosecutor's critical comments "could only have been intended" to persuade the district court to impose a higher sentence than the government had promised to recommend, "and not to guard against an unsolicited downward departure."[17] *Id.*

---

[17] We are not persuaded by the government's attempt to distinguish *Whitney* on the basis that the prosecutor there also separately breached the plea agreement by divulging confidential information. *Whitney* analyzed the two separate breaches of the plea agreement independently of each other. *See Whitney*, 673 F.3d at 970–71.

Here, the parties agreed to recommend that Morales receive a prison term equal to the low end of the applicable Guidelines range plus a three-year term of supervised release. The government breached its agreement, however, through its repeated and inflammatory references to Morales's criminal history in its sentencing memorandum. Like *Mondragon* and *Whitney*, all of the aggravating factual information in this memorandum had already been provided to the district court in the PSR. Moreover, there was no reason to believe that the district court was considering imposing a sentence less harsh than the stipulated one. Nor were the government's statements made off the cuff or in response to commentary or argument by the defense. Rather, given the opportunity to argue for the low-end sentence it had promised to recommend, the government offered a series of prejudicial "statements related to the seriousness of the defendant's prior record." *Whitney*, 673 F.3d at 971. The central theme of the government's sentencing position was that Morales was a dangerous recidivist who had spent twenty years flouting the law and menacing others. Whether intentional or not, the government breached the plea agreement by implicitly recommending a higher sentence than agreed upon.

We recognize that this case differs from *Whitney* in a significant respect: Here, the government bound itself to recommend not only a low-end Guidelines sentence, but also a statutory maximum three-year term of supervised release. This supervised release term is contrary to the Guidelines, which provide that "[t]he court ordinarily should *not* impose a term of supervised release" when a defendant, like Morales, is "likely [to] be deported after imprisonment." U.S.S.G. § 5D1.1(c) (emphasis added). The government contends that the inflammatory material was properly included in the

sentencing memorandum to support the recommended three-year term of supervised release.  We disagree.

As an initial matter, this does not appear to have been the government's actual motivation for the offending statements, almost none of which appear in the portion of the sentencing memorandum that discusses supervised release.  Furthermore, while the government could permissibly make some factual reference to Morales's criminal history to justify the stipulated term of supervised release, the government offers no justification for the depth and tone of its discussion.  That Morales possessed 56 balloons of heroin when arrested for selling drugs, and that his misdemeanor domestic violence conviction was for choking and shoving the mother of his infant daughter, are prejudicial details likelier to inflame than to provide information relevant to the imposition of supervised release.  *See* U.S.S.G. § 5D1.3(b).  And the prosecutor's references to Morales's "propensity for drug trafficking" and "consistent disregard for both the criminal and immigration laws of the United States" are merely pejorative editorializing.[18]

---

[18] The government could, for example, have said the criminal history was found in the PSR and incorporated it in its sentencing memorandum by reference.  The discussion of Morales's criminal history in the PSR included no editorializing or inflammatory language.  Indeed, the probation office adopted this approach in justifying its sentencing recommendation to the district court:

> In regard to Morales' criminal history, he has felony convictions for drug sales, receiving stolen property, and commercial burglary.  He also has a misdemeanor conviction for spousal abuse.  The longest sentence he received in the past was a year in county jail. . . .

Most important, the particular context of this fast-track plea agreement negates the government's purported justification for its statements.  Morales was induced to enter into a fast-track plea by the offer of a binding sentencing recommendation resulting in a lower prison term than he would receive if he pleaded guilty later.  To his detriment, Morales stipulated to the three-year term of supervised release even though he knew he would be deported following his release.[19]  As the parties acknowledged in briefing and at oral argument, a three-year term of supervised release is

> After considering the nature and circumstances of Morales' offense as well as his history and characteristics, a six month sentence followed by three years supervised release is recommended as sufficient but not greater than necessary.  A sentence of this length is the same length as the actual time served for the one year county jail sentence that Morales served in the past and it is hoped it will have an adequate deterrent effect and also promote respect for the law. . . .
>
> The advisory guidelines discourage a term of supervised release when not required by statute and when the defendant is a deportable alien.  However, a three year term is recommended as agreed to by the parties and as a term of this length will protect the public in light of Morales' prior convictions for drug sales.

---

[19] A mandatory condition of supervised release is that the defendant not commit any federal, state, or local crime.  *See* 18 U.S.C. § 3583(d). Morales's supervised release also included the routine condition that he comply with all immigration rules and regulations and not reenter the United States illegally.  Morales thereby agreed to additional punishment should he again be caught unlawfully returning to the United States.  He could be incarcerated for violating the terms of his supervised release, as well as subject to another § 1326 prosecution.

apparently a common provision of fast-track pleas in illegal reentry cases in the Central District of California.[20]   The government had no reason to call special attention to the ugliest aspects of Morales's past to justify what is, in these circumstances, a routine recommendation.

Indeed, given the government's promise of leniency, it is notable that its sentencing memorandum contained no mitigating information at all.   Rather, it emphasized that Morales, a "danger to the community," needed to be "deterre[d]" because of his "20-year criminal history," his "consistent disregard" for the law, and his criminal "propensity."   The reader is left to wonder why the government believed a low-end Guidelines sentence was appropriate in the first place.   Accordingly, we conclude that, as a whole and in context, the government's pejorative comments about Morales's criminal history and detailed descriptions of his prior offenses served "no purpose" but to argue for a harsher punishment than it had agreed to recommend.   *Whitney*, 673 F.3d at 971.   By implicitly advocating for a sentence other than the stipulated one, the government breached the plea agreement.

The government also breached its agreement with Morales in a second, independent way.  The government did not only agree to recommend a particular sentence, as in *Whitney*, or to avoid recommending a sentence, as in

---

[20] A review of our cases confirms that a three-year term of supervised release is not uncommon in illegal reentry prosecutions in the Central District of California.  *See, e.g.*, *United States v. Gutierrez*, No. 13-50008; *United States v. Cardenas*, 13-50045; *United States v. Canas*, 540 F. App'x 789 (9th Cir. 2013); *United States v. Meza*, 319 F. App'x 695 (9th Cir. 2009); *United States v. Ceja-Licea*, 264 F. App'x 594 (9th Cir. 2008).

*Mondragon*. It also expressly promised in the plea agreement not to "seek, argue, or *suggest in any way*" that the district court impose a "sentence other than what has been stipulated to by the parties herein." We enforce the literal terms of this promise and require the government's strict compliance with it. *See Whitney*, 673 F.3d at 974; *Franco-Lopez*, 312 F.3d at 989.

Even if the inflammatory language in the government's sentencing position had partially served a legitimate purpose, which it did not, it surely also "suggest[ed]" that the district court impose a harsher sentence. The government freely undertook a broad commitment to Morales to avoid even the implication that a sentence other than the stipulated one might be appropriate. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2286 (2002) (defining "suggest" as "to mention . . . as a possibility," "put forward by implication," or "propose . . . as desirable or fitting"). At a minimum, by characterizing Morales as a dangerous criminal, the sentencing memorandum suggested in some way that a sentence other than six months in prison could be advisable. Under this provision of the contract between Morales and the government, it is irrelevant whether these statements also served another purpose. Therefore, even if we did not conclude that the offending language had "no practical purpose" but to argue implicitly for a harsher than stipulated punishment, we would still conclude that the government breached the express terms of this plea agreement.

## C.

The government's breach of the plea agreement was neither cured nor curable before the district court.

The government filed a supplemental sentencing position in the district court in response to defense counsel's objection.  This supplemental filing did not acknowledge, let alone rectify, the government's previous errors.  It merely corrected two clerical mistakes and argued that the government's initial sentencing memorandum had properly "analyze[d]" Morales's criminal history to support the recommended three-year term of supervised release.  The government's denial that it had breached the agreement did not restore the united front for which Morales had bargained.

Moreover, even if the government had acknowledged its error in its supplemental memorandum, doing so would not have cured the breach.  Only "*some* breaches may be curable upon timely objection" to the district court.  *Puckett*, 556 U.S. at 140 (emphasis in original).  For example, if the prosecution makes a "mere slip of the tongue or typographical error," *United States v. Alcala-Sanchez*, 666 F.3d 571, 576 (9th Cir. 2012), or "simply forg[ets] its commitment and is willing to adhere to the agreement," *Puckett*, 556 U.S. at 140, the prosecution may cure the inadvertent mistake by promptly discharging its obligations.  But a breach like the one that occurred here cannot be undone.  Once the prosecution has forcefully argued for a sentence other than the stipulated one and has denied the defendant a united front, "one really cannot calculate how the government's error and breach may have affected the perceptions of the sentencing judge." *Alcala-Sanchez*, 666 F.3d at 577.  That the district court claimed not to have been influenced by the government's sentencing memorandum is simply "irrelevant."  *Camarillo-Tello*, 236 F.3d at 1028; *accord Santobello*, 404 U.S. at 262; *Gunn v. Ignacio*, 263 F.3d 965, 969–70 (9th Cir. 2001).

Nor does Morales's decision not to withdraw his plea before his sentence was imposed cure the government's breach.[21] Morales bargained for the opportunity to withdraw his plea if the district court rejected the plea agreement despite the government's support.  To conclude that Morales's choice not to withdraw his plea somehow negates the breach would force Morales to bear the burden of the government's error.  Indeed, it would effectively license the government to violate Rule 11(c)(1)(C) agreements with impunity, as the defendant would be compelled either to accept the result of the proceedings infected by the breach or to risk proceeding to trial or attempting to negotiate a new agreement with no leverage.  We decline to "lessen the government's duty of strict compliance" in this manner. *Alcala-Sanchez*, 666 F.3d at 577.

## V.

We do not review the breach of a plea agreement for harmless error on appeal.  *See, e.g.*, *Mondragon*, 228 F.3d at 981.  Rather, "automatic reversal is warranted when objection to the Government's breach of a plea agreement has been preserved."  *Puckett*, 556 U.S. at 141 (citing *Santobello*, 404 U.S. at 261–62).  Furthermore, "case law requires" that any further proceedings occur before a different judge, even if we have no doubt that the first district judge treated the defendant fairly and impartially.  *Alcala-Sanchez*, 666 F.3d at 577 n.2 (quoting *United States v. Johnson*, 187 F.3d 1129, 1136 n.7 (9th Cir. 1999)); *accord Whitney*, 673 F.3d at 968

---

[21] Once the district court rejected the plea agreement, as distinct from the plea itself, Morales's guilty plea became a "naked" plea, unaccompanied by any waiver of appellate review.  *See In re Vasquez-Ramirez*, 443 F.3d 692, 697 (9th Cir. 2006).

n.1.  Once the district judge has seen or heard the offending words that denied the defendant the benefit of his bargain, any further proceedings before him would necessarily be tainted by the government's breach.  The only way to undo the damage is to reassign the case.

When the district court rejects a Rule 11(c)(1)(C) plea agreement after overruling the defendant's objection to an alleged breach, the defendant may appeal the district court's order rejecting the plea agreement after the district court has entered judgment and imposed a sentence.  *See United States v. Samueli*, 582 F.3d 988, 993–94 (9th Cir. 2009); *In re Morgan*, 506 F.3d 705, 708–12 (9th Cir. 2007).  When the district court finds that the government breached a Rule 11(c)(1)(C) agreement and the defendant timely moves for specific performance, the district court must grant the motion, order the government to fulfill its obligations under the agreement, and immediately transfer the case to a different district judge to ensure that the decision to accept or reject the agreement will be untainted by the breach.[22]  *See Puckett*, 556 U.S. at 140.  If the district court fails to grant the defendant's motion for specific performance and instead rejects the Rule 11(c)(1)(C) agreement, it commits an error of law and thereby abuses its discretion.  *See Perry v. Brown*, 667 F.3d 1078, 1084 (9th Cir. 2012) ("[A]n error of law constitutes an abuse of discretion.").

---

[22] Morales's counsel did not seek the correct remedy before the district court, but instead suggested that the district court was required to impose a six-month sentence.  The government's breach does not strip the district court of its discretion to accept or reject the plea agreement; it merely requires prompt reassignment so the court's discretion may be exercised independently of the government's breach.

Vacatur of the defendant's sentence alone is an inadequate remedy for the district court's erroneous rejection of a Rule 11(c)(1)(C) agreement after the government breaches the plea agreement. By entering into a Rule 11(c)(1)(C) agreement, the defendant bargains for a binding sentencing stipulation and for the opportunity to withdraw his guilty plea if the district court rejects the stipulation after the government has advocated for it. If we were to vacate only the defendant's sentence and the government were to perform its obligations under the plea agreement before a different judge on remand, the district court would still retain the discretion not to accept the stipulated sentence. The defendant would be unable to withdraw his plea, however, because he is already subject to a judgment of conviction. A remand for resentencing only would therefore fail to "secure the benefits promised" the defendant, leaving him in a worse position than if the government had not committed the breach. *Franco-Lopez*, 312 F.3d at 989.

Accordingly, when a defendant timely objects, moves for specific performance, and successfully appeals the district court's post-breach order rejecting a Rule 11(c)(1)(C) plea agreement, the appropriate remedy is to vacate the conviction and sentence and remand for further proceedings before a different judge.[23] The defendant must have the opportunity

---

[23] We have suggested that, when the district court erroneously rejects a Rule 11(c)(1)(C) agreement for reasons unrelated to any breach, "any legally cognizable harm can be remedied on direct or collateral review of whatever *sentence* the district court ultimately imposes." *In re Morgan*, 506 F.3d 705, 713 (9th Cir. 2007) (emphasis added). Review of the sentence alone may provide a sufficient remedy under those circumstances because the defendant has not been denied the benefit of his bargain with the government, which does not and cannot promise that the district court will not err.

to withdraw his plea after the district court exercises its discretion to accept or reject the agreement in a manner unaffected by the government's breach.

In this case, however, Morales appealed only his sentence and did not seek vacatur of his conviction. We therefore vacate only his sentence and remand for resentencing before a different district judge.

## VI.

The Department of Justice has prosecuted an increasing number of federal immigration crimes in recent decades. To alleviate the resulting strain on the criminal justice system, it recommends substantial sentencing discounts for defendants who quickly plead guilty and waive important constitutional and procedural rights. Fast-track agreements, including those pursuant to Rule 11(c)(1)(C), serve the interests of all involved. The government is obligated to adhere strictly to their terms, just as it must—and usually does—honor its promises under all plea agreements.

The purpose of a fast-track plea is to achieve unusual efficiency through unusual leniency. Absent exceptional circumstances, therefore, the government should have little need to colorfully recount the details of the defendant's criminal history in its sentencing position in a fast-track case. In this case, the government's inflammatory discussion of Morales's previous crimes served no practical purpose but to argue implicitly for a harsher punishment than the government had agreed to recommend. It also violated the government's express promise not to suggest in any way that the district court impose a sentence other than the stipulated one.

Morales would ordinarily be entitled to vacatur of his conviction and sentence and a remand for further proceedings before a different district judge. But here, in light of the only remedy Morales requested, we vacate his sentence. On remand, the Clerk of the United States District Court for the Central District of California shall reassign the case to a different district judge.

**VACATED AND REMANDED** with instructions.