**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

GERARDO FARIAS-CONTRERAS,
AKA Tomas Gomez,

*Defendant-Appellant*.

No. 21-30055

D.C. No.
2:19-cr-00111-
WFN-17

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Wm. Fremming Nielsen, District Judge, Presiding

Argued and Submitted En Banc January 24, 2024
Pasadena, California

Filed June 3, 2024

Before: Mary H. Murguia, Chief Judge, and Ronald M.
Gould, Johnnie B. Rawlinson, Milan D. Smith, Jr., Morgan
Christen, Michelle T. Friedland, Mark J. Bennett, Eric D.
Miller, Daniel A. Bress, Patrick J. Bumatay and Roopali H.
Desai, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.;
Concurrence by Judge Gould;
Concurrence by Judge Bennett

## SUMMARY[*]

### Criminal Law

The en banc court affirmed a sentence in a case in which the defendant argued that the government breached its promise under the plea agreement not to recommend a sentence in excess of the low-end of the sentencing guidelines range when the government implicitly urged the district court to impose a harsher sentence.

Considering the record *in toto*, a majority of the panel found that the government's conduct crossed the line from permissible advocacy to an improper end-run of the plea agreement; the government thus implicitly breached its promise not to recommend a sentence in excess of the low-end of the calculated guideline range.

The majority concluded, however, that the error was not plain because this court's precedent does not make sufficiently clear to what extent the government may respond to a defendant's request for a downward departure without implicitly breaching the plea agreement.

The majority took the opportunity to clarify this court's law on the subject. In cases involving an implicit breach

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

claim, courts must look first to the plain language of the plea agreement. As long as the agreement does not expressly prohibit the government from responding to a defendant's request for a sentence lower than what is recommended by the government, the government has the latitude to respond. But the government's response must be tethered to its obligations under the plea agreement, even when responding to the defendant's specific request for a downward departure or to the court's questions. While a prosecutor need not invoke magic words each time he or she argues against mitigation or answers the court's questions, the government must comply with the letter and spirit of the plea agreement. That is, the government's arguments must be made in good faith and advance the objectives of the plea agreement. This is a fact-specific inquiry based on contract principles. Courts should look at the totality of circumstances and consider, *inter alia*, the sequencing, severity, and purpose of the statements. To the extent this court's precedent can be read to prohibit the government from presenting *any* information that is already known and contained in the presentence report, the majority rejected such a categorical rule. In cases where the government is entitled to respond to arguments by the defense, repeating facts in the presentence report does not constitute a per se breach.

Concurring, Judge Gould, joined by Judges Rawlinson and Desai, joined the majority in full. He wrote separately to add that the conclusion that there was error not only has the fundamental principles of contract law supporting it but also the constitutional protections given to plea bargains.

Concurring in the judgment, Judge Bennett, joined by Judges Miller, Bress, and Bumatay, agreed with the majority that the court should affirm and that no categorical rule

prohibits the government from presenting information already known to the court. He disagreed with the majority's conclusion that the government implicitly breached the plea agreement.

## COUNSEL

Scott A.C. Meisler (argued), Trial Attorney, Appellate Section, Criminal Division; Lisa H. Miller, Deputy Assistant Attorney General; Nicole M. Argentieri, Acting Assistant Attorney General; United States Department of Justice, Washington, D.C.; Caitlin A. Baunsgard, Russell E. Smoot, Ian Garriques, David M. Herzog, and Brian M. Donovan, Assistant United States Attorneys; Vanessa R. Waldref, United States Attorney; United States Department of Justice, Office of the United States Attorney, Eastern District of Washington; Spokane, Washington; for Plaintiff-Appellee.

Stephen R. Hormel (argued), Hormel Law Office LLC, Spokane Valley, Washington, for Defendant-Appellant.

Vincent J. Brunkow (argued) and Daniel J. Yadron, Jr., Federal Defenders of San Diego Inc., San Diego, California, for Amici Curiae Ninth Circuit Federal Public and Community Defenders.

## OPINION

M. SMITH, Circuit Judge, with whom MURGUIA, Chief Judge, and GOULD, RAWLINSON, CHRISTEN, FRIEDLAND and DESAI, Circuit Judges, join:

Plea agreements are an essential component of the criminal justice system. It is important—for the government, the defendant, and the functioning of the system—that they be enforced. Defendant-Appellant Gerardo Farias-Contreras appeals his 188-month sentence following his guilty plea to conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 841 and 846. He argues that the government breached its promise under the plea agreement not to recommend a sentence in excess of the low-end of the sentencing guidelines range when the government implicitly urged the district court to impose a harsher sentence. In response, the government contends that it merely articulated to the district court why the government's 151-month recommendation—a significant sentence for an older individual with serious medical conditions—was reasonable under the totality of the circumstances. For the reasons below, we conclude that there was no plain error in the government's conduct, and we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 28, 2020, Farias-Contreras entered into a plea agreement with the government and pleaded guilty to conspiring to distribute methamphetamine and heroin in violation of 21 U.S.C. §§ 841 and 846. Pursuant to the plea agreement, the government agreed, *inter alia*, to dismiss two other charges and "not to recommend a sentence in excess of the low-end of the guideline range, as calculated by the

United States." The plea agreement allowed Farias-Contreras to recommend any legal sentence and, for purposes of sentencing, allowed either party to present facts not included in the plea agreement's stipulated facts if "relevant to the guideline computation or sentencing." The district court accepted the guilty plea.

On January 19, 2021, Farias-Contreras filed his sentencing memorandum. He argued for a six-level reduction in the base offense level resulting in a guidelines range of 108–135 months and urged either a sentence within that range or a variance below it, citing his many physical disabilities. Thereafter, on January 29, 2021, the government filed its sentencing materials. After reducing the base offense level by three levels, the government calculated a guidelines range of 151–188 months and recommended a 151-month term, i.e., the low-end of the guidelines range.

Explaining its recommendation, the government first noted that Farias-Contreras had been "convicted of an unquestionably serious offense" and that "[d]rug trafficking is nothing less than pumping pure poison into our community." The sentencing memorandum proceeded to cite statistics of drug overdose deaths;[1] quote an excerpt

---

[1] The memorandum stated: "The effects of drug trafficking are massive, and in some respects, incalculable, especially when all the collateral consequences are considered. The damage the drugs this Defendant were peddling cause irreparable harm to the community in general as well as to families whose members are addicted to controlled substances. According to the Center for Disease Control, in 2018 in the United States, 67,367 individuals died from a drug overdose. In 2019, drug overdose deaths climbed to a record high – with a reported 70,980 deaths." (footnotes omitted).

from a book about the families of living drug addicts;[2] and quote a decades-old Fifth Circuit decision that suggests drug dealing is a "grave offense" worse than murder.[3] It concluded by emphasizing that Farias-Contreras was "the top of criminal culpability in this case," that his involvement in drug trafficking appeared to stem back to 1990, that he had not let his physical impairment stop him from engaging in this conduct, and that, ultimately, a significant sentence

---

[2] The memorandum stated: "Importantly, the damage is not limited to families who have suffered a death. As aptly recorded by Sam Quinones in the book 'Dreamland' about the families of living drug addicts:

> I met with other parents whose children were still alive, but who had shape-shifted into lying, thieving slaves to an unseen molecule. These parents feared each night the call that their child was dead in a McDonald's bathroom. They went broke paying for rehab, and collect calls from jail. They moved to where no one knew their shame. They prayed that the child they'd known would reemerge."

[3] The memorandum stated: "'Measured thus by the harm it inflicts upon the addict, and through him, upon society as a whole, drug dealing in its present epidemic proportions is a grave offense of high rank.' *Terrebonne v. Butler*, 820 F.2d 156, 157 (5th Cir. 1987), *cert. denied*, 484 U.S. 1020 (1989). The Circuit Court continued:

> Except in rare cases, the murderer's red hand falls on one victim only, however grim the blow; but the foul hand of the drug dealer blights life after life and, like the vampire of fable, creates others in its owner's evil image—others who create others still, across our land and down our generations, sparing not even the unborn.

*Terrebonne*, 820 F.2d at 157–58. While this opinion was authored over 30 years ago, it continues to ring true today."

was warranted to protect the community from his continued illicit activities.

At the sentencing hearing, Farias-Contreras again requested a sentence as low as 108 months. His request for a lower sentence was based principally on his physical condition: he had been shot multiple times, "still has the colostomy," "still has to have a urethra," "still has to use manual methods in order to relieve himself," and "can't walk" without braces.[4]

In response, the government stated first that it stood by the recommendation in its sentencing memorandum. Then, the government immediately noted that "the number of which that we're recommending was something that was of much discussion," prompting the court to ask, "Much discussion where?" The government clarified, "In our office--of what do we do with this particular defendant? [Farias-Contreras] is at the top of the food chain in terms of criminal culpability, in terms of personally directing and organizing the distribution of a massive, massive amount of drugs." The court commented that Farias-Contreras was willing to distribute thirty pounds of drugs back in 1998, to which the government responded, "That's very correct, very correct. So we have this individual, multiple years, multiple pounds, a massive amount of drugs that he is responsible for."

---

[4] Farias-Contreras also argued that "[o]ur government has said that for every year of life, there's two years that are taken off his life in longevity while he's in prison, and that's going to be happening. Prison for him is two times. It's twice as hard as it is for anybody else, and he's going to be punished. He's going to be punished for [his physical condition]."

At the end of its exchange with the court, the government reiterated:

> [W]e kept coming back in our discussions--everyone was very sympathetic to the physical condition and what that means for him, but we were unanimous in coming back to this physical condition has not deterred his conduct whatsoever.  He continued to be a leader/organizer, and there's nothing that will prevent him in the future to returning to that--that role. . . .  [E]veryone was unanimous in that a long period of incarceration is going to be necessary to protect the public from the defendant, to protect society.

"[B]ased on the totality of those circumstances," the government again stated that it was recommending the term of incarceration that it outlined in its sentencing memorandum.  The government did not specify at the hearing the number of months that it was recommending.

Citing substantially the facts and argument presented by the government, the district court adopted the government's guidelines range and sentenced Farias-Contreras to 188 months' imprisonment.  The district court first acknowledged Farias-Contreras's "serious limitations" and that "incarceration is not going to be easy."  The court then explained its concerns about the protection of the public and his lack of respect for the law, referencing the government's brief and oral presentation.  In particular, the court noted that Farias-Contreras was "top in the chain," "way up in the distribution"; how deeply involved he was in an organization "responsible for distributing in this geographic area huge

amounts of methamphetamine"; and that "[l]ives are lost. Lives are ruined. Families broken up, jobs lost, health deteriorated. Children become--it becomes available for children. Addicts are fed. So it's serious, very serious." The court rejected the government's recommendation as too low and determined that the high end of the guidelines range was justified.

On appeal, Farias-Contreras argues that the government implicitly breached its obligation in the plea agreement "not to recommend a sentence in excess of the low-end of the guideline range, as calculated by the United States." He argues that, although the government technically recommended a low-end sentence of 151 months, statements made by the government in its sentencing memorandum and at the sentencing hearing implicitly urged the district court to impose a longer sentence. A divided three-judge panel vacated Farias-Contreras's sentence and remanded to the district court for reassignment and resentencing. *United States v. Farias-Contreras*, 60 F.4th 534, 548 (9th Cir. 2023). We granted rehearing en banc, *United States v. Farias-Contreras*, 83 F.4th 1161 (9th Cir. 2023), and we now affirm the district court.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 18 U.S.C. § 3742(a). *See United States v. Heredia*, 768 F.3d 1220, 1230 (9th Cir. 2014). Generally, we review a defendant's claim that the government has breached its plea agreement de novo. *United States v. Mondragon*, 228 F.3d 978, 980 (9th Cir. 2000). Because Farias-Contreras failed to raise his objection at sentencing, we review here for plain error. *See United States v. Whitney*, 673 F.3d 965, 970 (9th Cir. 2012). "Relief for plain error is available if there has been (1) error; (2) that

was plain; (3) that affected substantial rights; and (4) that seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Minasyan*, 4 F.4th 770, 778 (9th Cir. 2021) (quoting *United States v. Cannel*, 517 F.3d 1172, 1176 (9th Cir. 2008)).

## ANALYSIS

Plea agreements are essentially contracts between the government and a defendant. *United States v. Myers*, 32 F.3d 411, 413 (9th Cir. 1994) (per curiam). As such, they are governed by principles of contract. *See id.* "In construing an agreement, the court must determine what the defendant reasonably understood to be the terms of the agreement when he pleaded guilty." *United States v. De la Fuente*, 8 F.3d 1333, 1337 (9th Cir. 1993) (footnotes omitted). We hold the government to "the literal terms of the agreement," *Myers*, 32 F.3d at 413 (quoting *United States v. Escamilla*, 975 F.2d 568, 571 (9th Cir. 1992)), and construe any ambiguities in the defendant's favor, *Heredia*, 768 F.3d at 1230.

At the time of sentencing, the law governing the plea-bargaining process was best summarized in our decisions in *Whitney*, 673 F.3d 965, and *Heredia*, 768 F.3d 1220. In *Whitney*, we explained that the government breaches its agreement by "implicitly arguing for a sentence greater than the terms of the plea agreement specified that the prosecution would recommend." *Whitney*, 673 F.3d at 971. "Although a sentencing recommendation need not be made enthusiastically, when the government obligates itself to make a recommendation at the low end of the guidelines range, it may not introduce information that serves no purpose but to influence the court to give a higher sentence." *Id.* (cleaned up). We explained further that "[t]his

prohibition precludes referring to information that the court already has before it, including statements related to the seriousness of the defendant's prior record, statements indicating a preference for a harsher sentence, or the introduction of evidence that is irrelevant to any matter that the government is permitted to argue." *Id.* (cleaned up). Such statements were recognized as introduced "solely for the purpose of influencing the district court to sentence [the defendant] more harshly." *Id.* (quoting *United States v. Johnson*, 187 F.3d 1129, 1135 (9th Cir. 1999)).

In *Heredia*, we added that "the government breaches its bargain with the defendant if it purports to make the promised recommendation while 'winking' at the district court to impliedly request a different outcome." 768 F.3d at 1231 (internal quotation marks omitted). "An implicit breach of the plea agreement occurs if, for example, the government agrees to recommend a sentence at the low end of the applicable Guidelines range, but then makes inflammatory comments about the defendant's past offenses that do not 'provide the district judge with any new information or correct factual inaccuracies.'" *Id.* (quoting *Whitney*, 673 F.3d at 971).

Farias-Contreras makes a strong argument that the government's conduct breached the plea agreement. Although the government promised "not to recommend a sentence in excess of the low-end of the guideline range, as calculated by the United States," it spent five pages in its sentencing memorandum arguing for why Farias-Contreras should be given a "significant sentence" and reiterated the same at the sentencing hearing. The government also made several inflammatory arguments, including in its sentencing memorandum statistics on drug overdose deaths, an excerpt from the book *Dreamland* about drug users shape-shifting

into "lying, thieving slaves," and a comparison of drug dealers to "the vampire of fable, creat[ing] others in its owner's evil image." Indeed, the government conceded at oral argument in our court that several of these remarks were ill-advised, and all but conceded that this case turns on the plainness prong.[5]

Moreover, the government seemed to invite the district court's skepticism as to its recommendation by noting "much discussion" in the U.S. Attorney's Office on what to "do with this particular defendant." That is, the government seemed to suggest that some prosecutors in the office did not agree with the low-end recommendation in light of Farias-Contreras being "at the top of the food chain in terms of criminal culpability, in terms of personally directing and organizing the distribution of a massive, massive amount of drugs," thereby "'winking' at the district court to impliedly request a different outcome." *See Heredia*, 768 F.3d at 1231 (internal quotation marks omitted). The government's nod to the court also supports the inference that any improper statements by the government were aimed at obtaining a sentence higher than what it recommended, rather than

---

[5] In response to the government's suggestion that this would be a "much easier case" had the prosecutor "signpost[ed]" her responses, the panel asked: "By making [that] argument, doesn't the government expose itself? If the defense counsel had objected, this would be a very different argument."

The government conceded: "I think that's right. I think you're right, Your Honor. I think some of these remarks, I think, are, well I should say, the sentencing memo is—I don't actually think the prosecutor did anything wrong at the hearing. The sentencing memo is close to the line. I would acknowledge that. But I do think the plain error rule serves a really important purpose in this context."

merely asking for a sentence above Farias-Contreras's request for 108 months.

On the other hand, a number of facts weigh against finding a breach. First, the government did, as promised, recommend the low-end of the guidelines both in its sentencing memorandum and at the sentencing hearing, even if only perfunctorily. Second, the plea agreement did not expressly prohibit the government from responding to Farias-Contreras's request for a below-guidelines sentence; to the contrary, the plea agreement allowed either party to present and argue "additional facts which are relevant to the guideline computation or sentencing, unless otherwise prohibited in this Plea Agreement." *See United States v. Maldonado*, 215 F.3d 1046, 1052 (9th Cir. 2000) ("[T]he government has a duty to ensure that the court has complete and accurate information, enabling the court to impose an appropriate sentence."). *But see United States v. Moschella*, 727 F.3d 888, 892 (9th Cir. 2013) (noting that the government expressly "reserved the right to oppose any defense argument for a reduced sentence" in the plea agreement). Finally, the government agreed that Farias-Contreras's physical condition was a mitigating factor for purposes of sentencing, noting that he is someone "who has very significant and undeniable physical limitations and concerns about being potentially vulnerable in the Bureau of Prisons."

Although this case presents a close question, considering the record here *in toto*, a majority of the panel finds that the government's conduct crossed the line from permissible advocacy to an improper end-run of the plea agreement. The prosecutor simply went too far. The government does not have carte blanche to use inflammatory rhetoric and to argue in excess for "a long period of incarceration" whenever a

defendant requests a below-guidelines sentence. To do so, in addition to inviting the court's skepticism as to the government's bona fide position, is to act "solely for the purpose of influencing the district court to sentence [the defendant] more harshly." *Whitney*, 673 F.3d at 971 (quoting *Johnson*, 187 F.3d at 1135). Thus, the government implicitly breached its promise not to recommend a sentence in excess of the low-end of the calculated guideline range.

However, the error was not plain. An error is plain when it is "clear or obvious, rather than subject to reasonable dispute." *Puckett v. United States*, 556 U.S. 129, 135 (2009). "[T]he second prong of plain-error review . . . will often have some 'bite' in plea-agreement cases. Not all breaches will be clear or obvious." *Id.* at 143.

Here, Farias-Contreras relies principally on our decisions in *Heredia*, *Whitney*, and *Mondragon*. But, as the government argues, none of those precedents is sufficiently instructive so as to signal "clear or obvious" error. For example, in *Heredia*, the parties agreed to recommend that the district court impose a stipulated sentence and that they would not argue "in any way" for an adjustment, departure, or variance in sentence. 768 F.3d at 1228. In *Whitney*, the plea agreement precluded the defendant from requesting a below-guidelines sentence, and he did not do so. 673 F.3d at 972. And in *Mondragon*, the plea agreement provided that the government would not make any recommendation regarding sentencing. 228 F.3d at 980. Unlike in those cases, the thrust of the issue here is that Farias-Contreras retained the right to request "any legal sentence," in fact argued for one as low as 108 months, and now contests the government's response to his request.

Even if we construed those cases to support Farias-Contreras's claim, our decision in *Moschella* creates at least a "reasonable dispute" as to whether the government's sentencing arguments crossed the line. *See Puckett*, 556 U.S. at 135. In *Moschella*, the plea agreement required the government to recommend a sentence no higher than the low-end of the guidelines range, allowed the defendant to argue for a below-guidelines sentence, and reserved the government's right to oppose that argument and to supplement the facts by providing relevant information to the court. *Moschella*, 727 F.3d at 890. At sentencing, the government opposed the defendant's request for a downward variance, arguing that the offense was serious and that the defendant was "motivated by greed, and that he was a danger to society." *Id.* at 891. We held that there was no implicit breach because the government's remarks "highlighting certain aspects of the offense" were "a fair response to [the defendant's] request for a downward variance from the low-end of the advisory Guidelines range." *Id.* at 892.

Because *Moschella* was based on facts substantially analogous to those here, and because our precedent does not make sufficiently clear to what extent the government may respond to a defendant's request for a downward departure without implicitly breaching the plea agreement, we find that the error committed by the government was not plain. We affirm on that basis and need not address the remaining prongs.

We take this opportunity, however, to clarify our law on the subject. In cases involving an implicit breach claim such as this, courts must look first to the plain language of the plea agreement. As long as the agreement does not expressly prohibit the government from responding to a defendant's

request for a sentence lower than what is recommended by the government, the government has the latitude to respond. In other words, as a default rule, the government can respond even if the plea agreement is silent on the issue.

But the government's response must be tethered to its obligations under the plea agreement, even when responding to the defendant's specific request for a downward departure or to the court's questions. While a prosecutor need not invoke magic words—such as reiterating the government's recommendation for a low-end sentence—each time he or she argues against mitigation or answers the court's questions, the government must comply with the letter and spirit of the plea agreement. That is, the government's arguments must be made in good faith and advance the objectives of the plea agreement. *Cf. Appling v. State Farm Mut. Auto. Ins. Co.*, 340 F.3d 769, 779 (9th Cir. 2003) (noting that state law implies a covenant of good faith and fair dealing in every contract). This is a fact-specific inquiry based on contract principles. Courts should look at the totality of circumstances and consider, *inter alia*, the sequencing, severity, and purpose of the statements.

Finally, to the extent our precedent can be read to prohibit the government from presenting *any* information that is already known and contained in the presentence report, we reject such a categorical rule. In cases where the government is entitled to respond to arguments by the defense, repeating facts in the presentence report does not constitute a per se breach.

## CONCLUSION

Under our rules, as clarified here, the government's conduct in this case constitutes an implied breach of the agreement. But because the law was not clear at the time of

sentencing, we do not find plain error.  Accordingly, we affirm Farias-Contreras's sentence.

**AFFIRMED.**

---

GOULD, Circuit Judge, concurring, with whom RAWLINSON and DESAI, Circuit Judges, join:

I join the majority opinion in full.  I write separately to add that the conclusion that there was error not only has the fundamental principles of contract law supporting it but also the constitutional protections given to plea bargains.

## I

Plea agreements are not ordinary contracts.  *Puckett v. United States*, 556 U.S. 129, 137 (2009) (although plea bargains are "essentially contracts," "the analogy may not hold in all respects."); *see also United States v. Transfiguracion*, 442 F.3d 1222, 1228 (9th Cir. 2006).  Because a plea agreement involves a criminal defendant, we have said that "[t]he interests at stake and the judicial context in which they are weighed require that something more than contract law be applied." *United States v. Barron*, 172 F.3d 1153, 1158 (9th Cir. 1999).  In assessing a plea agreement, we not only engage in contract interpretation, but also ensure the guarantees of a criminal defendant's constitutional rights.  *See Santobello v. New York*, 404 U.S. 257, 262 (1971); *see also United States v. Jackson*, 21 F.4th 1205, 1213 (9th Cir. 2022) ("[W]e are mindful of the unique constitutional concerns involved in plea agreements.").

We have held that the government must "strictly comply with its obligations under a plea agreement." *United States v. Mondragon*, 228 F.3d 978, 981 (9th Cir. 2000).  Similarly,

our sister circuits have held that the Constitution demands that courts "scrutinize the government's conduct to ensure that it comports with the highest standard of fairness."[1] *United States v. Vaval*, 404 F.3d 144, 152 (2d Cir. 2005) (quoting *United States v. Lawlor*, 168 F.3d 633, 637 (2d Cir. 1999)). The majority's overview of the law, which builds on the principles articulated in *United States v. Whitney*, 673 F.3d 965 (9th Cir. 2012) and *United States v. Heredia*, 768

---

[1] *See also United States v. Kurkculer*, 918 F.2d 295, 297 (1st Cir. 1990) (requiring "more than good faith by the government in securing through plea bargaining a defendant's waiver of constitutional rights"); *United States v. Cruz*, 95 F.4th 106, 110 (3d Cir. 2024) ("Because defendants give up many constitutional rights by entering plea bargains, courts must carefully scrutinize them to insure that the government has fulfilled its promises." (cleaned up)); *United States v. Warner*, 820 F.3d 678, 683 (4th Cir. 2016) ("[W]e nonetheless give plea agreements greater scrutiny than we would apply to a commercial contract because a defendant's fundamental and constitutional rights are implicated." (cleaned up)); *United States v. Munoz*, 408 F.3d 222, 226 (5th Cir. 2005) ("[T]he Government must strictly adhere to the terms and conditions of its promises in [a plea] agreement."); *United States v. Ligon*, 937 F.3d 714, 718 (6th Cir. 2019) ("Because a defendant obtains a plea agreement only at the expense of his constitutional rights, prosecutors are held to meticulous standards of performance." (cleaned up)); *United States v. Bowler*, 585 F.2d 851, 854 (7th Cir. 1978) (holding prosecutors to the "most meticulous standards of both promise and performance"); *United States v. Brown*, 5 F.4th 913, 916 (8th Cir. 2021) (requiring of the government "meticulous fidelity to the plea agreement"); *United States v. Villa-Vazquez*, 536 F.3d 1189, 1199 (10th Cir. 2008) (because the enforceability of a plea agreement is to some extent "a matter of constitutional due process," the government has a "heightened responsibility"); *United States v. Hunter*, 835 F.3d 1320, 1330–31 (11th Cir. 2016) (holding prosecutors to the "most meticulous standards of both promise and performance"); *United States v. Moreno-Membache*, 995 F.3d 249, 256 (D.C. Cir. 2021) ("We are loath to assume that a defendant surrendered a panoply of constitutional rights in exchange for a meaningless and valueless promise.").

F.3d 1220 (9th Cir. 2014), clarifies what is required under this exacting standard. Strict compliance with the terms of a plea agreement is essential to ensure fair treatment by the government and to protect the fundamental rights of the criminal defendant entering the plea bargain.

I express two additional points, both of which support the majority opinion's correct conclusion that there was error.

## A

First, if a plea agreement is silent on the matter, the default rule established by the court's majority opinion today makes clear that the government can respond to a defendant's request for a lower sentence. This default rule, standing alone, does not convey the full importance and authority of a plea bargain. For a plea agreement to be valid, a defendant must enter into it fully aware of its terms. *Santobello*, 404 U.S. at 261–62. Because the government bears "responsibility for any lack of clarity" in a plea agreement, the government should set a defendant's expectations through clear and express communication. *United States v. Franco-Lopez*, 312 F.3d 984, 989 (9th Cir. 2002) (quoting *United States v. Anderson*, 970 F.2d 602, 607 (9th Cir. 1992)).

Most important in interpreting the terms of a plea agreement entered by a criminal defendant is the perspective of the defendant, not that of the government. We have held that we determine "what the *defendant* reasonably understood to be the terms of the agreement when he pleaded guilty." *United States v. De la Fuente*, 8 F.3d 1333, 1337 & n.7 (9th Cir. 1993) (emphasis added). Any unintended ambiguities in a plea bargain may be interpreted adversely to the government, and so the government is best served by

making the parties' aims clear and express in a plea bargain. This is a sensible application of the basic contract principle of *contra proferentem*. *Transfiguracion,* 442 F.3d at 1228.

But we do not treat a defendant who exchanges his constitutional rights the same as an ordinary, private contracting party. The Fourth Circuit has explained that, while private contracting parties would be equally at fault for mistakes in negotiating a contract, shortcomings of a criminal defense counsel in plea bargaining are less relevant because "the validity of a bargained guilty plea depends finally upon the voluntariness and intelligence with which the defendant—and not his counsel—enters the bargained plea." *United States v. Harvey*, 791 F.2d 294, 301 (4th Cir. 1986). It is the government that bears "primary responsibility for insuring precision in the agreement." *Id.* Because "a defendant's liberty is at stake, the government is ordinarily held to the literal terms of the plea agreement it made so that the government gets what it bargains for but nothing more." *Transfiguracion,* 442 F.3d at 1228 (cleaned up). The government, rather than the defendant, will more likely bear the consequences for not expressly specifying a plea agreement's terms at the outset.

**B**

Second, the prosecutor can breach a plea agreement even by arguments made because of the prosecutor's duty to advocate for the highest appropriate sentence on behalf of the government or because of the prosecutor's duty to respond honestly to inquiries made by the sentencing court. *See United States v. Maldonado*, 215 F.3d 1046, 1052 (9th Cir. 2000). Prosecutors must "remain aware of the possibility of conflict" between their various duties, and "may not attempt to use one duty as an instrument for

thwarting" the government's obligations under a plea agreement. *United States v. Saxena*, 229 F.3d 1, 6 (1st Cir. 2000); *accord Munoz*, 408 F.3d at 227; *see e.g.*, *Whitney*, 673 F.3d at 969–72 (holding there was error and that it was plain even though the prosecutor stated at the sentencing hearing that defendant's arguments put her "between a rock and a hard spot"). Even if a prosecutor unintentionally violates a plea agreement's implicit terms, it will still be a breach of the plea agreement. *Heredia*, 768 F.3d at 1232–33.

It is prudent, even if not necessary, for a prosecutor to specify the number of months the government recommends. A prosecutor's argument that does not state the months recommended can more easily be construed as involving "inflammatory comments" or "pejorative editorializing" that "serves no purpose but to influence the court to give a higher sentence." *Heredia*, 768 F.3d at 1231, 1233; *Whitney*, 673 F.3d at 971 (internal quotation marks omitted). Without an anchor in a specific number of months being recommended, such comments are more likely, as here, to constitute a breach of the plea agreement. *Cf. United States v. Moschella*, 727 F.3d 888, 892 (9th Cir. 2013) (noting that "in arguing against a downward variance, the prosecutor affirmatively recommended three times that the district court impose the agreed-upon 33-month sentence"). The prosecutor must provide substantial "justification for the depth and tone of [the prosecutor's] discussion." *Heredia*, 768 F.3d at 1233. A prosecutor's utterance of the months of sentence recommended is not a *per se* fulfillment of the government's duties under a plea agreement. A prosecutor who perfunctorily recommends a specific sentence, but urges inflammatory language that induces a higher sentence, speaks with a forked tongue.

For the government to honor a plea agreement in good faith, proportionality is important. In a properly-implemented plea bargain, a defendant loses the right to defend against a criminal charge, while gaining the benefit of knowing what sentence will be recommended by the government to the court. And the government gains the certainty of a criminal conviction rather than the uncertainty of a trial where guilt needs to be proved beyond a reasonable doubt. Honoring a plea bargain in words and deed presents a "united front" to the sentencing court that gains "the added persuasiveness of the government's support" for a recommended sentence. *United States v. Camarillo-Tello*, 236 F.3d 1024, 1028 (9th Cir. 2001).

While no categorical rule prohibits the government from presenting information already in the presentence report, the government should temper recitation of a defendant's criminal history with support for the agreed upon sentencing recommendation. *Cf. Heredia*, 768 F.3d at 1224 (stating that the prosecutor's recommendation of a six-month prison term "rang hollow" because the prosecutor unnecessarily reiterated the defendant's criminal history). A prosecutor's duty to urge an appropriate sentence is not a license to use any means in responding to a defendant's request for a lower sentence. A deal is a deal, and the government must abide by the terms of its plea agreement. Some response to a request for a lower sentence than recommended by the government is appropriate and may be necessary for the ends of justice to be met. But excess in response defeats the purposes of and contradicts the terms of the plea agreement.

## II

In cases involving an alleged *implicit*, as opposed to explicit, breach of a plea agreement, the court must be

particularly mindful of holding the government to a high standard of fairness.

BENNETT, Circuit Judge, with whom Circuit Judges MILLER, BRESS, and BUMATAY join, concurring in the judgment:

I agree with the majority that we should affirm. I also agree with the majority that no categorical rule prohibits the government from presenting information already known to the court. I respectfully disagree, however, with the majority's conclusion that the government implicitly breached the plea agreement.[1]

The government agreed "not to recommend a sentence in excess of the low-end of the guideline range, as calculated by the United States." It fulfilled that promise. It repeated—multiple times—that the court should give a sentence at the bottom of the guideline range it calculated. Also, as permitted by the *express* terms of the plea agreement, the government introduced "additional facts . . . relevant to the guideline computation or sentencing." Those added facts served a manifestly valid purpose: to respond to Farias-Contreras's arguments for a much lower sentence than the one recommended by the government and to justify the government's own recommendation of 151 months. Thus, no matter the test for determining whether the government

---

[1] The government argued in its supplemental brief to the en banc court that there was no implicit breach. Contrary to the majority's suggestion, the government maintained that position at oral argument: "We are asking the court to hold at prong one [of the plain error test] that there was no error, but at a minimum that the error was not plain and not prejudicial."

implicitly breached a plea agreement, there was no implicit breach here.

# I

Farias-Contreras was charged with conspiracy to distribute 500 grams or more of methamphetamine or to distribute heroin, and possession with intent to distribute 500 grams or more of methamphetamine. He entered into a plea agreement with the government in which he pleaded guilty to the conspiracy charge. The plea agreement contained a lengthy statement of stipulated facts showing that Farias-Contreras had supplied multi-pound quantities of heroin and methamphetamine to many individuals over many years. The presentence report ("PSR") stated that Farias-Contreras was responsible for a total converted drug weight of at least 186,181 kilograms, which is *more than 200 tons*. The PSR also noted:

> Mr. Farias-Contreras utilized drug runners/couriers. The drug runners/couriers would travel from and to the Eastern District of Washington to the greater Los Angeles area, to retrieve large quantities of controlled substances from various locations at the direction of Mr. Farias-Contreras. The drug runners/couriers would then bring the controlled substances to the Eastern District of Washington and distribute the substances to customers as directed by Mr. Farias-Contreras.

The plea agreement expressly allowed the parties to supplement the facts: "This statement of facts does not preclude either party from presenting and arguing, for

sentencing purposes, additional facts which are relevant to the guideline computation or sentencing, unless otherwise prohibited in this Plea Agreement." The government agreed "not to recommend a sentence in excess of the low-end of the guideline range, as calculated by the United States." The agreement permitted Farias-Contreras to "recommend any legal sentence."

The PSR calculated a guideline range of 235 to 293 months. Farias-Contreras objected, noting that in his view the correct guideline range was 210 to 262 months. Farias-Contreras's sentencing memorandum argued that the court should depart significantly downward to a range of 108 to 135 months—more than 50% lower than the PSR-calculated guideline range—for various reasons, including because of his significant medical conditions.

The government then filed its sentencing memorandum, seeking a sentence of 151 months.[2] And as it promised, the government did not recommend a sentence above the low end of the guideline range it calculated; it affirmatively recommended "a term of incarceration of 151 months"—the low end of its calculated guideline range. In other words, the government started its path toward the supposed breach with a low-end guideline calculation that was *35% less* than the PSR's, and *28% less* than Farias-Contreras's own calculation (before his recommended departure).

The government's memorandum then argued that despite his physical limitations, Farias-Contreras was at "the top of criminal culpability . . . as a multi-pound-level source of supply to multiple individuals, spanning over the course

---

[2] Farias-Contreras has never claimed that the government breached the plea agreement by recommending a sentence of 151 months.

of multiple years." The memorandum highlighted facts from the PSR that supported the government's recommendation. The memorandum also included supplemental information about the harm that drug trafficking causes to the community, including drug-overdose statistics, an excerpt from a book about families living with drug addicts,[3] and a Fifth Circuit case[4] discussing drug-dealing offenses.[5] *See* Maj. 6–7. The majority takes issue with this supplemental information. Maj. 6–7, 12–13. But all of it was relevant to sentencing, as it concerned the "seriousness of [Farias-Contreras's] offense." 18 U.S.C. § 3553(a)(2)(A). Thus, the express terms of the plea agreement allowed the government to introduce such information. And again, Farias-Contreras was asking for a possible sentence of 108 months—30% less than the government's low-end recommendation of 151 months (and 54% less than the PSR's low-end calculation).

At sentencing, Farias-Contreras's counsel told the court that the prosecutor had been "straightforward and level and frank," "honest," and "fair"—seemingly the opposite of a prosecutor who had supposedly breached the plea agreement. Farias-Contreras's counsel again argued that the court should impose a sentence as low as 108 months—a

---

[3] At sentencing, Farias-Contreras's counsel mentioned the book that the government quoted: "The memorandum that the United States wrote with the quote from the book explaining that about—discouraged that this problem is with methamphetamines and stuff, he [Farias-Contreras] gets that."

[4] I cannot conceive of a situation in which citing a decision by a sister circuit could constitute an implicit breach of a plea agreement. But even if such a circumstance *could* exist, there would still be no implicit breach here given the circumstances.

[5] For simplicity, I refer to this information as the "supplemental information."

sentence far below the government's low-end recommendation of 151 months—because of his undisputed severe physical impairments.

The government, consistent with its obligation under the plea agreement, explicitly told the court *twice* during the sentencing hearing that it stood by the recommendation in its memorandum—the low-end guideline sentence of 151 months. The government stated that it was "standing by the recommendation . . . in [its] sentencing memo," and again that it was "recommending the term of incarceration . . . outlined in [its] sentencing memo."

The district court determined that the government's recommendation was "too low" and imposed a sentence of 188 months (the high end of the court's calculated guideline range, but still 20% below the low end of the PSR's guideline range). The district court imposed this sentence mainly because Farias-Contreras was a leader of a large drug-trafficking organization and had trafficked drugs for a long time. At the outset of the sentencing hearing, the court noted its concern that Farias-Contreras's "entire adult life . . . ha[d] been dedicated to dealing drugs" and that he lacked "respect for the law." The court then turned to the PSR, highlighting information that showed Farias-Contreras had distributed large amounts of heroin and methamphetamine to multiple purchasers and had been dealing drugs for a long time. For example, he employed a courier who regularly transported *20 to 25 pounds* of methamphetamine to Washington every few weeks and returned to California with $30,000 to $40,000 each time. In 1998, Farias-Conteras was convicted of possession of a controlled substance for sale and sentenced to two years' imprisonment. In connection with that conviction, the PSR noted that Farias-Contreras told a confidential informant that

he would sell the informant *30 pounds* of methamphetamine. In 2008, he was dealing drugs in pound quantities.

The district court concluded sentencing with: "I think the high end is justified for the reasons that I've stated. In brief summary, a huge organization over a long period of time, [Farias-Contreras was] one of the top dogs in it, and so the 188 months, I think, is a fairly low sentence."

## II

"Plea agreements are contractual in nature and are measured by contract law standards." *United States v. Keller*, 902 F.2d 1391, 1393 (9th Cir. 1990). Thus, "[w]e enforce their literal terms." *United States v. Heredia*, 768 F.3d 1220, 1230 (9th Cir. 2014). "In determining whether a plea agreement has been broken, [we] look to what was reasonably understood by the defendant when he entered his plea of guilty." *United States v. Travis*, 735 F.2d 1129, 1132 (9th Cir. 1984) (cleaned up) (quoting *United States v. Arnett*, 628 F.2d 1162, 1164 (9th Cir. 1979)), *overruled on other grounds by United States v. Medina-Luna*, 98 F.4th 976, 980 (9th Cir. 2024). When the government promises to recommend a particular sentence, it commits an implicit breach if it "superficially abide[s] by its promise to recommend a particular sentence while also making statements that serve no practical purpose but to advocate for a harsher one." *Heredia*, 768 F.3d at 1231.

There can be no implicit breach when, as here, the government's acts conformed to "what was reasonably understood by the defendant when he entered his plea of guilty." *Travis*, 735 F.2d at 1132 (cleaned up) (quoting *Arnett*, 628 F.2d at 1164); *see also Metcalf Constr. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014) ("[A]n act will not be found to violate the duty [of good faith and fair

dealing] (which is implicit in the contract) if such a finding would be at odds with the terms of the original bargain, whether by altering the contract's discernible allocation of risks and benefits or by conflicting with a contract provision.").

While the plea agreement required the government to recommend the low end of its calculated guideline range—a promise that the government fulfilled—it did not prohibit the government from responding to Farias-Contreras's request for a sentence lower than the government's recommendation. In addition, the plea agreement expressly permitted the government to present any "additional facts . . . relevant to the guideline computation or sentencing." Thus, as a whole, the plea agreement made clear that, if Farias-Contreras requested a sentence lower than the government's recommendation, the government could respond with any additional relevant facts. That defense counsel told the court at sentencing that the prosecutor had been "straightforward and level and frank," "honest," and "fair" shows that the government's acts aligned with Farias-Contreras's reasonable expectations. That should be the end of the inquiry.

But even were we to go further, there was still no implicit breach because the government provided the supplemental information for a legitimate reason. *See United States v. Moschella*, 727 F.3d 888, 892 (9th Cir. 2013) (finding no implicit breach when the plea agreement permitted the parties to supplement the facts and the government's arguments were made in response to the defendant's request for a lower sentence). The majority concludes otherwise because it believes that the government's challenged statements were made "solely for the purpose of influencing the district court to sentence [the defendant] more harshly."

Maj. 15 (alterations in original) (quoting *United States v. Whitney*, 673 F.3d 965, 971 (9th Cir. 2012)). The majority's belief is belied by the record.

The government introduced its supplemental information *after* Farias-Contreras argued for a sentence well below the government's recommendation and the PSR's calculated guideline range. As the majority notes, Farias-Contreras's memorandum emphasized his severe physical impairments. Faced with Farias-Contreras's memorandum—and without knowing how much weight the judge would give to his sympathetic medical circumstances—it was at least reasonable for the government to provide supplemental information to rebut Farias-Contreras's position and to justify a 151-month sentence.[6] The majority faults the government for advocating a "significant sentence" and "a long period of incarceration." Maj. 12, 14. But the 151-month sentence that the government was permitted to seek was just that: a significant sentence and a long period of incarceration. Such a sentence requires a significant justification, and the government was entitled to present one.

---

[6] The Supreme Court famously said, almost ninety years ago:

> *But, while [the United States Attorney] may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.*

*Berger v. United States, 295 U.S. 78, 88 (1935).*

The prosecutor here struck no foul blows but instead used legitimate means to bring about a just sentence for a defendant who had devoted his entire adult life to dealing drugs and who was responsible for the distribution of more than *200 tons* of converted drug weight.

This is not a case in which the government's supplemental information "served no practical purpose but to argue implicitly for a harsher punishment than the government had agreed to recommend." *Heredia*, 768 F.3d at 1237. Instead, the information had the purpose of arguing, contrary to Farias-Contreras's position, that a sentence of 151 months was "not greater than necessary" to achieve the purposes of federal sentencing. 18 U.S.C. § 3553(a). Again, that defense counsel described the government's actions as "straightforward and level and frank," "honest," and "fair" all but confirms that the government's actions were a fair response to Farias-Contreras's position.

In short, there was no implicit breach because the government's actions were expressly permitted by the plea agreement. Were there a need to go beyond that, there was still no implicit breach because the record shows that the government's supplemental information served a valid purpose other than to implicitly argue for a sentence higher than 151 months' imprisonment.

## III

Because there was no implicit breach under contract-law standards, I see no reason for the majority to provide a new "totality of [the] circumstances" test. Maj. 17. In any event, this new test adds uncertainty to an area where there should be none. If expressly permitted by the plea agreement, how much supplemental information is *too much*? Does it depend on the numerical difference between the government's recommended sentence and the defendant's requested sentence? Should the government refrain from citing any authority—even decisions of a United States Court of Appeals—that might contain "inflammatory rhetoric"? There are no clear answers, as it depends on the

"circumstances." To alleviate this uncertainty, the government may seek to protect itself in ways that harm defendants. For example, it could refuse to agree to recommend a particular "low-end" sentence, load the plea agreement with the most damaging possible facts, and/or expressly reserve the right to make any argument for its recommended sentence. None of those outcomes would be desirable for defendants.

But even were I to agree with the majority's new test, the government still did not commit an implicit breach. The government provided the supplemental information *after* Farias-Contreras advocated for a much lower sentence. The supplemental information therefore furthered a valid purpose: to rebut Farias-Contreras's arguments. Indeed, the prosecutor's statements at the sentencing hearing, which the majority highlights, tied the government's arguments to Farias-Contreras's physical conditions: "[E]veryone was very sympathetic to [his] physical condition and what that means for him, but . . . everyone was unanimous in that a long period of incarceration is going to be necessary to protect the public from the defendant . . . ." Maj. 9.

While some of the supplemental information was frank in discussing the harms caused by drug trafficking, the defendant's serious misconduct justified the government making these arguments. The government had to show why a sentence of 151 months, rather than Farias-Contreras's much lower proposed sentence, was warranted. It was therefore reasonable for the government to provide truthful substantial aggravating arguments in rebuttal.[7]

---

[7] Because the majority applies a totality-of-the-circumstances test, the prosecutor's passing comment that the government's recommendation

*          *          *

For the reasons above, I respectfully disagree with the majority's opinion that the government implicitly breached the plea agreement.

---

was "of much discussion" in the U.S. Attorney's Office cannot outweigh all the other considerations suggesting that the government's supplemental information was not aimed at obtaining a sentence higher than what it recommended.