FILED

05/20/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0251

DA 23-0251

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 105

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

ROBERT RONALD BRADY,

      Defendant and Appellant.

APPEAL FROM:   District Court of the First Judicial District,
In and For the County of Broadwater, Cause No. DDC-2022-17
Honorable Christopher D. Abbott, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Tammy A. Hinderman, Appellate Defender Division Administrator,
Kathryn Grear Hutchison, Assistant Appellate Defender, Helena,
Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Christine Hutchison,
Assistant Attorney General, Helena, Montana

          Kevin Bratcher, Broadwater County Attorney, Townsend, Montana

          Submitted on Briefs:  February 27, 2025

          Decided:  May 20, 2025

Filed:

                _____
                         Clerk

Justice Katherine Bidegaray delivered the Opinion of the Court.

¶1 Robert Brady appeals his March 2023 judgment and sentence from the Montana First Judicial District Court, Broadwater County. We address three issues:

1. *Did the prosecutor breach the plea agreement?*

2. *Does a district court have unilateral authority, pursuant to §§ 46-18-201(4)(p) and -202(1)(g), MCA, to restrict a defendant's right to seek early termination of a deferred or suspended sentence?*

3. *May a defendant agree to waive or restrict the right to seek early termination of a deferred or suspended sentence?*

We reverse and remand.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2 In July 2022, the State charged Brady with felony Assault with a Weapon under § 45-5-213, MCA. The charge arose from an incident, in late June 2022, involving Brady, his wife Carmen Brady, his stepdaughter Alyssa Pecnick, and Alyssa's husband Ryan Pecnick. Brady allegedly told Ryan to leave Brady's property, but Ryan refused. Brady then entered his house, retrieved a shotgun, pointed it directly at Ryan's face, and threatened to kill him. Alyssa and Carmen were present during the incident, during which a scuffle broke out between Brady and Ryan and Carmen got shoved while trying to intervene. Brady appeared intoxicated to responding deputies, and claimed he used the shotgun to protect himself but later claimed that it was not loaded.[1]

---

[1] After first appearing in Justice Court on summons days after the incident, the court released Brady on the condition that he have no contact with Ryan, Alyssa, or Carmen. This no-contact condition remained an incorporated condition of his release after appearing in District Court in July 2022. At the September 2022 Omnibus hearing, the District Court lifted the no-contact order as it pertained to Carmen.

¶3     In August 2022, Brady pleaded not guilty, and the case proceeded to trial. In December 2022, the State petitioned to revoke Brady's release, alleging he failed to comply with pretrial alcohol monitoring conditions. At the January 5, 2023, hearing, the court sent Brady to jail for his noncompliance.

¶4     The next day, Brady and the State signed a binding plea agreement[2] pursuant to which Brady agreed to plead guilty to the offense of Assault with a Weapon in exchange for the State's promise to recommend a three-year deferred imposition of sentence. The agreement "restricted [Brady] from applying for early discharge of his deferred imposition of sentence until two (2) years after the date of Sentencing" and provided for the State's withdrawal from the agreement if Brady violated any court-imposed conditions.

¶5     The same day, the District Court held a change of plea hearing and Brady pleaded guilty pursuant to the plea agreement.[3] The court accepted his guilty plea, ordered a Presentence Investigation Report (PSI), and released Brady subject to conditions, including that he have no contact with the victim or witnesses. Prior to sentencing, the State again petitioned to revoke Brady's release for alleged alcohol monitoring violations, and Brady was arrested but later released on the condition that he wear an ankle bracelet.

¶6     At sentencing, the prosecutor opened by informing the District Court that, despite Brady's alcohol monitoring condition violations, the State was not withdrawing from the plea agreement. The court responded that it was "contemplating not following the plea

---

[2] *See* § 46-12-211(1)(a), (b), (4), MCA (binding plea agreements).

[3] The January 6, 2023, change of plea hearing audio file was subsequently lost and there is no transcript of that hearing in the record except the District Court's minute entry.

agreement based on" those violations and wanted to "talk about" it "a little more."  The court then allowed each party to justify the joint three-year deferred sentence recommendation.

¶7     Beginning with the State, the court noted Ryan's victim impact statement, included in the PSI, which asked the court to impose prison time.  The court asked:  "prison's not a likely outcome" here, "but did you give any thought to any incarceration time?"  The prosecutor explained that, while mindful of his "long history" dealing with Brady and his family's legal woes, he tried to be objective and "not overly" punitive.  He also called attention to the sentencing conditions, including no contact with anyone involved, chemical dependency treatment, violent offender registration, no firearm possession, and ineligibility to seek early discharge from the deferral of imposition of sentence until Brady had served two years of the three-year deferral despite being statutorily entitled to seek discharge after 18 months.  Regarding the no-contact condition, the prosecutor noted that the charge was filed in his absence, but that there could have been "three victims of the offense given that . . . they were all present and would have all . . . probably provided . . . evidence that they were in fear."

¶8     Turning to the defense, the court noted concerns regarding Brady's most recent alcohol monitoring violations and his apparent lack of accountability.  The court pointed to Brady's PSI statements where he blamed the incident on everyone else and cast himself as a victim acting in self-defense.  Defense counsel responded that Brady served jail time on the last revocation and violated no condition since; he had minimal criminal history; and if his deferred sentence were revoked, Brady would face 20 years.  Counsel also

4

explained that Brady was entitled to believe he was acting in self-defense even while admitting guilt. Returning to Ryan's victim impact statement, the court noted that Brady emotionally abused, threatened, and frightened his family for years. Defense counsel responded that even the prosecutor acknowledged the family had "some issues," and that not every incident over the years was Brady's fault.

¶9 Defense counsel also addressed the plea agreement condition that Brady have no contact with "the victims of the offense" and the State's request that it apply to Carmen and Alyssa, who were witnesses, not "victims." Defense counsel argued that Brady was not convicted of a crime against his wife (Carmen), and in fact, she had "been charged with multiple crimes of violence against him." Counsel believed that a civil protection proceeding was the better place to address Brady's allowed contact with Carmen or Alyssa. Given Brady's current state of unemployment, defense counsel was unsure of Brady's ability to pay the associated court costs. Finally, defense counsel asked the court to follow the plea agreement.

¶10 The court gave the prosecutor an opportunity to respond. Regarding Brady's purported inability to pay court costs, the prosecutor stated that Brady was "basically . . . living off of his wife," "not working," and "not doing anything productive." As to Brady's PSI statements, his self-defense claim, and the no-contact condition, the prosecutor stated:

> If this case went to trial, . . . what the jury would hear is that the home was owned by Carmen Brady before Robert Brady ever showed up. . . . He put his name on the house. He didn't pay anything for the house. And [Carmen] was at the time telling Alyssa and Ryan they could be at the house while [Robert] was simultaneously saying it's my house, you have to leave. He

5

literally left this argument in the drive and went inside the house and returned with a gun to threaten them. Nobody was threatening him, nobody was chasing him. So I was taken aback by Mr. Brady's statements in the PSI that the Court noted where he's blaming everybody else for everything. We just heard more of it today, let's blame Carmen for all this stuff.

Mr. Brady has been repeatedly in either district court or justice court, and each time that he didn't get a conviction was because Carmen came in as a witness and said, please don't. Please don't give – it's a cycle of really domestic violence and alcohol abuse where maybe that's why I said that at the outset. Maybe I was erring on the side of leniency for Mr. Brady given the background of the family. Maybe I erred in not pushing some of these prior cases through despite at that time it was Carmen's wishes.

[Ryan's] statement here describes very clearly the environment that we're in. The environment that Mr. Brady has placed his entire family in. That's why the entire family at this point is asking for the no contact provision to be part of his sentence.

So I'm very concerned that we're at a point now of no accountability. What does that mean, it means how successful is Mr. Brady going to be on his sentence? If he makes it three years, great, we'll all be happy for him. But if he doesn't make it three years and he commits a violation or he does something where he faces revocation, I suspect he will be here blaming someone other than himself.

So I'm concerned about it. I've already committed to stick to the recommendation in the plea agreement, but, again, Judge, you're right in terms of the things that are troubling about this case. . . . It's possible that I let my sympathy for the family go the wrong way and not be as hard on Mr. Brady as he probably deserves.

¶11 Defense counsel immediately objected on the grounds that the prosecutor's comments were a breach of the plea agreement. The prosecutor answered:

I'm asking the court to follow the plea agreement and *there's times people get a better deal than they're entitled to*. Maybe he is, but I think that the tale will be told over the next three years of his conduct. So the court should give him a chance to prove that he can take responsibility.

(Emphasis added.)

¶12 Brady addressed the court and apologized for his actions. No additional witnesses testified for either party. The District Court then sentenced Brady to a five-year deferred imposition of sentence and required him to serve the entire sentence in order "to have it taken off of his record." The court said it would "not entertain any request for early termination of that deferred sentence."[4] The court also modified the no-contact condition to include the witnesses, Brady's wife and stepdaughter. Finally, the court imposed a 14-day jail sentence, various other conditions, fines, and court costs. As reasons for the sentence, the District Court explicitly relied on the prosecutor's comments, noting Brady's minimal criminal history was likely due to previously dismissed charges and remarking that domestic violence was often "underprosecuted and underpunished." Because the plea agreement was a § 46-16-211(1)(b), MCA, binding agreement, the court allowed Brady an opportunity to withdraw his guilty plea pursuant to § 46-12-211(4), MCA. Reserving his right to appeal the breach issue, Brady declined to withdraw his plea.

¶13 After the District Court pronounced its sentence, the prosecutor explained his prior commentary. He stated for the record that his comments were "specifically responsive" to defense counsel's "victim blaming" and presentation of "completely incorrect information." The court then stated that it "already felt" that the three-year deferred sentence recommendation was "too lenient," regardless of the prosecutor's "side comment," and that the prosecutor's commentary did not influence the court's decision. Brady timely appeals.

---

[4] In its March 2023 written judgment and sentence, the court stated that Brady was "prohibited from applying for early termination of his deferred imposition of sentence."

**STANDARD OF REVIEW**

¶14    Whether a prosecutor breached a plea agreement is a question of law we review de novo for correctness. *State v. Shephard*, 2010 MT 20, ¶¶ 7-8, 355 Mont. 114, 225 P.3d 1217. Whether a criminal sentence or condition is illegal or exceeds statutory authorization is a question of law subject to de novo review. *State v. McGhee*, 2021 MT 193, ¶ 11, 405 Mont. 121, 492 P.3d 518; *State v. Grana*, 2009 MT 250, ¶ 11, 351 Mont. 499, 213 P.3d 783.

**DISCUSSION**

¶15    *1. Did the prosecutor breach the plea agreement?*

¶16    Plea agreements, contracts generally subject to applicable contract law standards, require strict prosecutorial adherence to fairness and obligations assumed. *State v. Rardon (Rardon II)*, 2002 MT 345, ¶¶ 16, 18, 313 Mont. 321, 61 P.3d 132. Defendants waive fundamental constitutional rights when they plead guilty pursuant to plea agreements and therefore have "a substantive right to be treated fairly throughout the plea bargain process." *State v. Collins*, 2023 MT 78, ¶ 25, 412 Mont. 77, 528 P.3d 1106; *Rardon II*, ¶¶ 16, 18; *State v. Allen*, 199 Mont. 204, 208-09, 645 P.2d 380, 382 (1981) (citing *Santobello v. New York*, 404 U.S. 257, 262, 92 S. Ct. 495, 498-99 (1971)). Accordingly, prosecutors who engage in plea bargaining must meet "strict and meticulous standards of both promise and performance." *State v. Hill*, 2009 MT 134, ¶ 29, 350 Mont. 296, 207 P.3d 307; *State v. McDowell*, 2011 MT 75, ¶ 14, 360 Mont. 83, 253 P.3d 812.

¶17    While a prosecutor "enjoys wide latitude in submitting evidence to a sentencing judge, the presentation of the State's case must be tempered by any obligations or

8

restrictions created by way of a plea agreement." *Rardon II*, ¶ 19; *State v. Rardon (Rardon III)*, 2005 MT 129, ¶ 18, 327 Mont. 228, 115 P.3d 182. When the State agrees to recommend a specific sentence in a plea agreement, a prosecutor is "obligated to approach sentencing in a manner that will not undermine" the recommendation. *McDowell*, ¶¶ 14, 16; *State v. Bartosh*, 2007 MT 59, ¶ 19, 336 Mont. 212, 154 P.3d 58. Accordingly, a prosecutor "must give more than lip service" to the State's sentencing recommendation.[5] *Bartosh*, ¶ 19; *Hill*, ¶ 29; *State v. Ellison*, 2017 MT 88, ¶ 15, 387 Mont. 243, 393 P.3d 192. There are no "hard and fast criteria that define when a prosecutor has merely paid 'lip service' to a plea agreement" as opposed to when he "fairly, but strongly, presented the State's case in order to influence a court to accept its sentencing recommendation." *Rardon II*, ¶ 21; *Bartosh*, ¶ 19; *Ellison*, ¶ 15. Instead, each case "stands or falls" on its unique facts, considered in context of the entire sentencing proceedings. *Rardon II*, ¶ 21; *Ellison*, ¶¶ 15, 19; *Collins*, ¶ 25. Generally, however, prosecutorial conduct that "would almost undoubtedly cause the court to question the appropriateness of the recommended sentence," or convince the court that a sentencing recommendation "should not be accepted," will "effectively undercut the plea agreement." *See Rardon II*, ¶ 22; *Bartosh*, ¶ 19; *Ellison*, ¶ 15; *Rardon III*, ¶ 19 ("[a] failure in this regard would constitute a breach of the plea agreement").

---

[5] "Lip service" means only "avowed expressions of adherence, devotion, or allegiance . . . by words but not by deeds." *Lip Service*, *Webster's Unabridged Third New International Dictionary* (2021).

¶18    In *Rardon II*, the prosecutor breached the plea agreement by "soliciting inflammatory testimony" regarding the length of the sentencing recommendation and by "reiterating and emphasizing negative aspects" of the defendant's sex offender evaluation. *Rardon II*, ¶¶ 19-20. We held that "the prosecutor's fervor in soliciting and offering evidence that would almost undoubtedly cause the court to question the appropriateness of the recommended sentence effectively undercut the plea agreement." *Rardon II*, ¶ 22. In *State v. LaMere*, 272 Mont. 355, 356-59, 900 P.2d 926, 927-29 (1995), the prosecutor breached the plea agreement by failing to "present the benefits" of the sentencing recommendation and instead "emphasizing" the defendant's alcoholism and failures to "complete anything he started." We held that the prosecutor "failed to meet the strict and meticulous standards of performance of the plea bargain." *LaMere*, 272 Mont. at 360, 900 P.2d at 929.

¶19    Here, like *LaMere* and *Rardon II*, the prosecutor breached the State's obligation by explicitly undermining the plea agreement, questioning its fairness, and implicitly encouraging rejection. Statements characterizing the recommended sentence as too lenient, suggesting Brady repeatedly evaded responsibility, and claiming Brady got "a better deal than [he was] entitled to" clearly violate the State's duty to advocate for the plea agreement. Such comments inevitably lead sentencing courts to doubt the propriety of the agreed-upon sentence.

¶20    In contrast, the State's reliance on *Ellison* is distinguishable. In *Ellison*, the prosecutor made appropriate comments directly responsive to defense arguments, which did not explicitly undermine the agreed-upon recommendation. In response to Ellison's

10

arguments that a deferred sentence would give her a chance to treat her underlying medical disorder—which she said was the cause of her chemical dependency—the State noted that Ellison had been perpetually noncompliant with drug testing conditions and lacked housing. *Ellison*, ¶ 9. The court then sentenced Ellison in excess of the plea agreement recommendation, reasoning that she could not overcome her drug dependency issues without incarceration. *Ellison*, ¶ 10.

¶21 On appeal, Ellison argued that the prosecutor breached the plea agreement by offering statements about her noncompliance for "no other purpose than to influence the [court] to impose a harsher sentence." *Ellison*, ¶ 16. We disagreed. First, the court was "already acutely aware" of Ellison's failures to comply with the drug monitoring conditions of her release, and therefore the prosecutor's comments "were merely addressing the challenges Ellison faced, which were obvious to everybody." *Ellison*, ¶¶ 17-18, 22 (also noting court's statements that it would not consider Ellison's treatment as a factor in sentencing absent evidence that she had treatment scheduled). Second, the prosecutor's comments were in direct response to defense counsel's discrete argument that Ellison should receive an accommodation for a recommended drug-testing probation condition for her prescription pain medication. *Ellison*, ¶ 19 (noting that defense counsel was essentially "laying the framework for future leniency for any drug-related probation violation"). The prosecutor was allowed to "counter" counsel's assertions "to the effect that [they were] misleading or untrue"—and he did so by addressing Ellison's persistent prescription drug abuse. *Ellison*, ¶ 19 (citing *Bartosh*, ¶ 22). We held that, "in the broader context" of the sentencing proceedings, the prosecutor's comments could not be construed as "an attempt

11

to undermine" the State's sentencing recommendation. *Ellison*, ¶¶ 16-22. *See also* *Bartosh*, ¶¶ 11-15, 22 (no breach where prosecutor offered testimony to rebut defendant's assertion that he was compliant with his treatment plan).

¶22 Here, where from the start, the District Court was on the fence regarding the parties' joint deferred sentence recommendation, and it voiced specific concerns regarding Brady's alcohol monitoring condition violations and his apparent lack of accountability and victim-blaming, the prosecutor's remarks went far beyond responding to defense counsel's assertions, explicitly suggesting Brady did not deserve the agreed-upon recommendation. Defense counsel attempted to assuage the court's concerns by noting that Brady (1) violated no conditions since his last release;[6] (2) took accountability for his conduct but believed it was justified under the circumstances; and (3) was not the only party to acts of violence in the family, as confirmed by the prosecutor's prior statements regarding the family's persistent legal troubles. Conversely, instead of advocating for the parties' bargained-for sentencing recommendation, the prosecutor asserted that: (1) Brady was essentially a deadbeat living off his wife; (2) Brady and his family were in "a cycle" of "domestic violence and alcohol abuse"; (3) he had previously dismissed charges against Brady at Carmen's request and "erred in not pushing some of [the] prior cases through";

---

[6] On appeal, the State asserts that some of the prosecutor's comments were in response to defense counsel's "continued . . . assert[ions] that Brady's alcohol monitoring devices were defective." When responding to the court's concerns regarding Brady's monitoring condition violations, his counsel briefly noted that a man Brady was staying with "witnessed him blowing on the date of violation and there must have been some sort of issue." Contrary to the State's assertions here, none of the prosecutor's comments mentioned the failed breath test or addressed any defense "implication that Brady's violations . . . may have been due to faulty devices."

12

(4) Brady took "no accountability" for his conduct and "blam[ed] everybody else for everything"; (5) questions remained regarding "how successful" Brady would be on his deferred sentence; (6) the court was "right in terms of the things that are troubling about this case"; and (7) he was not "as hard on Mr. Brady as he probably deserves" and "err[ed] on the side of leniency."

¶23    In context of the District Court's stated concerns, the prosecutor's commentary reinforced the court's inclination to reject the plea agreement and validated its skepticism that the recommended sentence was too lenient.  Moreover, after defense counsel objected, instead of tempering his commentary, the prosecutor stated:  "I'm asking the court to follow the plea agreement *and there's times people get a better deal than they're entitled to.*"  Unlike in *Ellison*, the prosecutor went well beyond merely rebutting an isolated argument or factual assertion—e.g., Brady's counsel's argument against the no-contact condition applying to the victim *and* witnesses—to stating outright that he likely "err[ed] on the side of leniency" and the agreed sentence was less than what Brady deserved.  We hold that the prosecutor's statements would almost undoubtedly cause the court to question the appropriateness of the State's recommended sentence or convince the court that it should not be accepted, and therefore effectively undercut the plea agreement.  *See Rardon II*, ¶ 22; *Bartosh*, ¶ 19; *Ellison*, ¶ 15; *Rardon III*, ¶ 19.

¶24    The State further asserts that there was no prosecutorial breach because the District Court stated that the prosecutor's commentary did not influence its decision.  However, immediately prior to announcing its sentence, the District Court gave its reasons for deviating from the plea agreement recommendation.  For example, while noting that Brady

13

had a minimal criminal history, based on the prosecutor's "intimat[ions]," the court attributed Brady's minimal criminal history to prior cases against him being "dropped" by the prosecutor. The court also stated concern that Brady had committed an act of violence against family members. Referring to "the cycle" of domestic violence in the family previously "alluded to" by the prosecutor, the court noted that "domestic violence is underprosecuted and underpunished." Despite disclaiming reliance on the prosecutor's commentary, the District Court directly referenced the prosecutor's statements in its sentencing rationale.

¶25 Prosecutors must refrain from comments that cast doubt on their recommendations, explicitly or implicitly, to avoid undermining plea agreements. Defense counsel must promptly object if they perceive prosecutorial breach, as defense counsel properly did here. Sentencing courts must independently assess recommendations and carefully avoid reliance on prosecutorial comments that explicitly undermine plea agreements. Here, although the prosecutor made the agreed-upon sentencing recommendation, he paid it mere lip service by casting doubt on the recommendation. Accordingly, we hold that the prosecutor breached the plea agreement. We will address the remedy for the State's breach below.

¶26 *2. Does a district court have unilateral authority, pursuant to §§ 46-18-201(4)(p) and -202(1)(g), MCA, to restrict a defendant's right to seek early termination of a deferred or suspended sentence?*

¶27 The parties dispute the appropriate remedy for the State's breach. Brady contends that the plea agreement provision restricting his right to seek early termination of the recommended three-year deferred sentence until he has served two years of that sentence

14

is illegal. Therefore, he asks for specific performance of the plea agreement before a new judge and without the State's recommendation of the restriction condition. The State contends that the restriction condition was bargained-for consideration and therefore, the plea agreement must be performed in its entirety; otherwise, the remedy for breach is Brady's withdrawal of his guilty plea. To resolve which remedy is appropriate, we must determine whether the plea agreement may restrict Brady's right to seek early termination of a deferred sentence.

¶28 Montana law explicitly allows defendants to seek early termination of a deferred sentence after serving the lesser of two years or one-half of the sentence (§ 46-18-208(1)(a), MCA) or a suspended sentence after serving the lesser of three years or two-thirds of the time suspended (§ 46-18-208(1)(b), MCA). As pertinent here, "upon termination of the time remaining on a deferred sentence" for a felony conviction, "the court shall strike" the defendant's guilty plea "from the record and order that the charge or charges against the defendant be dismissed." Section 46-18-204(1)(a), MCA (provided that no § 46-18-203, MCA, petition to revoke the deferred sentence has been filed). Section 46-18-208(1), MCA, therefore, creates a statutory right for a defendant to seek early termination of a deferred or suspended sentence and, in the case of a deferred sentence, expedite the dismissal process once the defendant has served a certain portion of the sentence and complied with all supervision conditions. Notably, the right is to *seek*, not receive, early discharge. *Accord State v. Harrison*, 2016 MT 271, ¶ 13, 385 Mont. 227, 383 P.3d 202 (recognizing § 46-18-208, MCA, as a "statutory right, enacted by the Legislature").

¶29 A court's authority to impose a sentence is defined and constrained by statute and the court has no power to impose a sentence absent specific statutory authority. *State v. Ruiz*, 2005 MT 117, ¶ 12, 327 Mont. 109, 112 P.3d 1001; *State v. Hatfield*, 256 Mont. 240, 346, 846 P.2d 1025, 1029 (1993). Here, the District Court's sentencing condition prohibiting Brady from seeking early termination of his sentence was not expressly authorized by §§ 46-18-201 or -202, MCA.[7] Nonetheless, the State argues that a sentencing court has "broad authority" under §§ 46-18-201(4)(p) and -202(1)(g), MCA, to prohibit a criminal defendant from seeking early termination of a deferred sentence because § 46-18-201(4)(p) authorizes a court to impose "any other reasonable restrictions or conditions considered necessary for rehabilitation or for the protection of the victim or society"; and § 46-18-202(1)(g) permits a court to impose "any other limitation reasonably related to the objectives of rehabilitation and the protection of the victim and society."

¶30 We disagree that §§ 46-18-201(4)(p) or -202(1)(g), MCA, authorize a court to restrict a defendant's statutory right to seek early termination of a deferred or suspended sentence under § 46-18-208, MCA. While §§ 46-18-201(4)(p) and -202(1)(g), MCA, generally authorize a sentencing court to impose "any other reasonable restrictions or conditions" on a sentence, § 46-18-208, MCA, specifically permits a defendant to seek early termination of that sentence upon certain time served and compliance with supervision conditions. To the extent any conflict exists between limitations a court may

---

[7] Compare § 46-18-202(2), MCA, which expressly authorizes a sentencing court to restrict a defendant's eligibility for parole or supervised release when sentencing him to a prison term of more than one year.

impose under §§ 46-18-201(4)(p) and -202(1)(g), MCA, and the limitations imposed on a defendant's right to seek early termination of that sentence by § 46-18-208, MCA, the specific requirements of § 46-18-208, MCA, control. *See* § 1-2-102, MCA. Accordingly, we hold that a sentencing court may not unilaterally impose a sentencing condition restricting a defendant's right to seek early termination of a sentence under § 46-18-208, MCA.

¶31    *3. May a defendant agree to waive or restrict the right to seek early termination of a deferred or suspended sentence?*

¶32    Although a court may not unilaterally restrict a defendant's statutory rights, a defendant may waive his § 46-18-208, MCA, right to seek early discharge in exchange for the State's promise to recommend a particular sentence, dismiss other pending charges, or both, just as a defendant may waive a constitutional or other statutory right. *See, e.g.*, *Ellison*, ¶ 14 (plea agreement effects a waiver of fundamental constitutional rights "in exchange for the State's assurances"); *State v. Watts*, 2016 MT 331, ¶ 19, 386 Mont. 8, 385 P.3d 960 (guilty plea "constitutes a waiver of all non-jurisdictional defects and defenses, including claims of constitutional rights violations which occurred prior to the plea"); *Campbell v. Mahoney*, 2001 MT 146, 306 Mont. 45, 29 P.3d 1034 (discussing private rights waivable under § 1-3-204, MCA ("any person may waive the advantage of a law intended solely for that person's benefit")).

¶33    Here, by agreeing to wait two years instead of the 18 months the statute otherwise allowed for seeking early discharge of a deferred sentence, Brady obtained a recommendation for a three-year deferred sentence, binding on the court, on a felony

17

offense that carried a maximum 20-year sentence. *See* § 45-5-213, MCA (assault with a weapon). A deferred imposition of sentence made Brady eligible to have his conviction dismissed and disappear from his public criminal record. Section 46-18-204(1)(a), (2), MCA. The State is correct that its promise to recommend imposition of a three-year deferred sentence was conditioned, among other things, on Brady's reciprocal promise to be "restricted from applying for early discharge of his deferred imposition of sentence until two (2) years after the date of Sentencing." The State *and* the defendant must be held to their plea bargain promises. *See Hill*, ¶ 29 ("prosecutors, as well as defendants, are bound by the plea agreements they make"); *State v. Keys*, 1999 MT 10, ¶ 19, 293 Mont. 81, 973 P.2d 812 ("we will not assist a defendant in escaping the obligations of his plea agreement after he has received its benefits").

¶34 Accordingly, we hold that, although a court may not unilaterally restrict a defendant's right to seek early termination of a sentence under § 46-18-208, MCA, the court may impose a restriction in excess of the § 46-18-208 minimum time-served requirements if the defendant has agreed to the restriction in a plea agreement. In the case of a § 46-12-211(1)(a)-(b), MCA, binding plea agreement, if the court rejects the plea agreement, or sentences the defendant in excess of the agreed recommendations, the defendant may withdraw the prior plea or pleas and have his rights restored. Section 46-12-211(4), MCA; *State v. Munoz*, 2001 MT 85, ¶ 18, 305 Mont. 139, 23 P.3d 922.

¶35 Here, Brady knowingly entered into a plea agreement acknowledging and waiving his trial rights and promising, in exchange for the State's sentencing recommendation, that

18

he would not seek discharge of the three-year deferred sentence until two years after the date of sentencing. We conclude that specific performance of the parties' January 2023 plea agreement in its entirety is the appropriate remedy for the State's breach.

¶36 Finally, Brady asks that resentencing take place before a different judge. Ordinarily, "specific performance entitles a defendant to a resentencing by a different judge in accordance with the plea agreement." *State v. Rardon (Rardon I)*, 1999 MT 220, ¶ 13, 296 Mont. 19, 986 P.2d 424 (citing *State v. Persak*, 256 Mont. 404, 847 P.2d 280 (1993));[8] *Munoz*, ¶ 16 (citing *Rardon I*, ¶ 13); *Santobello*, 404 U.S. at 263, 92 S. Ct. at 499. When remanding for specific performance of a plea agreement, we may direct that a different judge conduct resentencing.[9] Directing resentencing before a new judge is not a commentary on the individual sentencing judge's fairness, but rather, an acknowledgment that a prosecutor's breaching conduct inevitably undermines the fairness of the entire sentencing proceedings. *See Persak*, 256 Mont. at 407-08, 847 P.2d at 282 (specific performance before a different judge "cured" any possible prejudicial effects of the State's

---

[8] In *Persak*, upon concluding that the State breached the plea agreement, the trial court judge denied the defendant's motion to withdraw his guilty plea and instead vacated the judgment, sealed the record, disqualified himself, and ordered specific performance of the plea agreement by the State at resentencing "before a different judge who was untainted by the breach of the plea agreement." *Persak*, 256 Mont. at 406-07, 847 P.2d at 281-82. We affirmed, holding that the court had provided the defendant a remedy—specific performance—and that "[a]ny prejudice as a result of the State's breach of the plea agreement was cured" at resentencing before another judge. *Persak*, 256 Mont. at 407-08, 847 P.2d at 282. We later overruled *Persak* and *Rardon I* in *Munoz*, ¶ 38, however, to the extent that those cases left the choice of remedy for the State's breach in the sole discretion of the trial court.

[9] *See Rardon I*, ¶ 18; *Rardon II*, ¶ 26 (directing resentencing before a different judge and different prosecutor); *State v. Rahn*, 2008 MT 201, ¶¶ 25-27, 344 Mont. 110, 187 P.3d 622, *overruled in part on other grounds by State v. Newbary*, 2020 MT 148, ¶ 5 n.1, 400 Mont. 210, 464 P.3d 999.

breach); *Rardon II*, ¶¶ 17, 23, 25-26 (State's breach "tainted" sentencing procedures, thus necessitating specific performance before a new judge and by a new prosecutor).[10] To undo all prejudicial effects of the prosecutor's breach of the plea agreement, we grant Brady's requested relief and direct that a different judge conduct his resentencing.

## CONCLUSION

¶37    We hold that the prosecutor breached the plea agreement by paying lip service to the parties' agreed sentencing recommendation. We further hold that a district court does not have unilateral authority, pursuant to §§ 46-18-201(4)(p) or -202(1)(g), MCA, to restrict a defendant's right to seek early termination of a sentence under § 46-18-208, MCA. Finally, we hold that a defendant, like Brady, may agree in a plea agreement to waive or restrict the right to seek early termination of a deferred or suspended sentence. Accordingly, we vacate Brady's March 2023 judgment and sentence and remand to the Montana First Judicial District Court for specific performance of the plea agreement in its entirety at resentencing before a different judge.

¶38    Reversed and remanded for resentencing in accordance with this opinion.

/S/ KATHERINE M BIDEGARAY

---

[10] *Accord United States v. Camper*, 66 F.3d 229, 233 (9th Cir. 1995) ("resentencing before a different judge in no way implies criticism of the sentencing judge" but "is done simply to insure compliance with the plea agreement"); *United States v. Alcala-Sanchez*, 666 F.3d 571, 575-77 (9th Cir. 2012) (given a court's independent authority in rendering a sentence, any prejudice resulting from prosecutorial breach is "not calculable"; therefore, resentencing before a different judge is necessary "to eliminate [the] impact" of the government's breach); *United States v. Morales Heredia*, 768 F.3d 1220, 1235-37 (9th Cir. 2014) (once the sentencing judge "has seen or heard the offending words that denied the defendant the benefit of his bargain, any further proceedings before him would necessarily be tainted by the government's breach" and thus "the only way to undo the damage is to reassign the case").

We Concur:

/S/ INGRID GUSTAFSON
/S/ LAURIE McKINNON
/S/ JIM RICE

Chief Justice Cory J. Swanson has recused himself and took no part in these proceedings.

Justice James Jeremiah Shea, dissenting and concurring.

¶39    When considering the context of the remarks made by the respective parties at Brady's sentencing hearing, it bears noting that as the prosecutor observed at the outset of the hearing, and Brady did not dispute, the State would have been entitled to withdraw from the plea agreement based on Brady's violations of his pretrial release conditions. Yet the prosecutor reiterated to the Court that he was *not* asking to withdraw from the agreement, despite those violations. The District Court responded to the prosecutor's statement by immediately advising the parties that it was contemplating not following the plea agreement. The District Court advised the parties that it had two issues with the deal Brady was getting. The first issue was Brady's failure to comply with his pretrial release conditions. The second issue was because, as the District Court observed, Brady's statement in the PSI regarding the crime to which he was pleading guilty was "about as devoid of remorse as a person could be." The District Court observed that Brady "blamed this whole incident on everyone else but him[self] and he casts himself as the victim and acting in self-defense."

21

¶40 With that stage being set, rather than changing his tune at the hearing and "attempt[ing] to assuage the [District Court's] concerns," Opinion, ¶ 22, as the Court characterizes it, Brady proceeded to present a case study in remorseless victim blaming. Every statement in which Brady ostensibly took responsibility for his crime was followed by a "but." Brady's counsel told the District Court that Brady was "taking accountability" for his crime, but Brady *still* felt "that he might have *had a right*" to put a shotgun in Ryan's face and threaten to kill him in front of Ryan's wife and mother-in-law. Brady's counsel told the Court that he didn't "want to litigate [Brady's] family life," yet he somehow felt it relevant to tell the court that Brady had gotten a restraining order against "another one of his sons through marriage"—someone who was not even present at the time of Brady's crime or involved in this incident in any way. When the prosecutor reasonably objected and pointed out that this "person is not present," Brady's counsel responded "I'm just saying that like clearly *this family in general* has had some issues and *I don't think that all the blame because Mr. Brady was charged in this case should absolutely go on him*." Regarding the "issues" "this family" was dealing with, Brady's counsel characterized Brady's involvement as "attempt[ing] to help . . . them cop[e]" with their issues— apparently with a session of drunken shotgun therapy. In response to Brady's wife and stepdaughter asking the District Court to impose a no contact order as a condition of Brady's deferred sentence because of their fear of him, Brady's counsel responded that the no-contact condition should only apply to "the *actual victim* in this case." Failing to recognize that both Brady's wife and her daughter were present when he pointed the shotgun in Ryan's face and threatened to kill him in front of them, Brady's counsel stated

22

that if his stepdaughter "or his wife don't wish to have contact with him, then they can go to the Court and petition for that" because "that's what divorce attorneys are for." When the District Court pointed out that divorce was a separate process and what the court was considering with the no-contact condition was "protecting potential victims of domestic violence from . . . who they contend is their abuser," Brady's counsel responded: "Your Honor, I'm not trying to throw mud or anything *but*[1] it's my understanding that my client has never been convicted of a crime against his wife, but she has at least been charged with multiple crimes of violence against him."

¶41 After approximately fifteen minutes of Brady "taking responsibility" for his actions, the District Court moved on to Brady's contention that he was unable to pay the financial obligations of his sentence. When the District Court asked why Brady wasn't able to pay his fines and fees, Brady's counsel stated that it was because of "the lack of contact with his wife which has not allowed him to resolve his financial situation." When the District Court sought clarification on that point, Brady himself represented that it was because "I haven't been able to find a job. Well, my job has been that we have a ranch and I take care of the animals there. That's what I've done for several years."

¶42 All of Brady's and his counsel's statements came *before* the prosecutor made *any* of the comments that Brady now contends were unwarranted and designed to undermine the plea agreement. But when Brady was finished, the District Court asked for the prosecutor's response. The prosecutor responded to Brady's argument that he should not

---

[1] As this Court is well aware, any sentence that begins with words to the effect of, "I'm not trying to throw mud or anything *but* . . ." almost always ends with a whole lot of mud being thrown.

23

be subject to a no-contact condition as to his wife and stepdaughter because they were not "actual victims," and Brady's portrayal of his wife as the actual abuser in their marriage, by noting the prior incidents of domestic violence that did not result in charges against Brady only because the prosecutor had followed the wishes of Brady's wife. The prosecutor then accurately noted that even as to the current offense, the State could have charged Brady with assault with a weapon regarding his wife and stepdaughter because they were both present when Brady retrieved the shotgun and threatened to kill Ryan in front of them. The prosecutor responded to Brady's assertion that he was unable to pay the recommended fines and fees because the no-contact provision prevented him from working his job "tak[ing] care of the animals" on his "ranch" by clarifying that "[t]his ranch that he claims he's working for and took care of is not an . . . actual ranch where he's out making a living being a cowpuncher." In further response to Brady's claims of indigency solely because he was an out-of-work "rancher," the prosecutor clarified that in reality "if the Court went into a detailed inquiry as to the property and the assets and the income, the Court would find that he's basically been living off of his wife. Not working, not doing anything productive." The prosecutor responded to Brady's argument that the District Court should not fault him for SCRAM violations by reminding the Court of Brady's history of substance abuse. The prosecutor responded to Brady's assertion that he should be credited for his remorse by pointing to his PSI responses which, as the court had already recognized, demonstrated a complete lack of accountability for his actions.

¶43    "If a defendant chooses to present information in support of a sentence he argues for, the State may counter with testimony to the effect that such information is misleading

24

or untrue, without breaching a plea agreement." *State v. Ellison*, 2017 MT 88, ¶ 19, 287 Mont. 243, 393 P.3d 192 (quoting *State v. Bartosh*, 2007 MT 59, ¶ 22, 336 Mont. 212, 154 P.3d 58). In *Ellison*, we determined that a prosecutor did not undermine a plea agreement where he (1) "expressed concern about Ellison's chemical dependency and her inability to remain sober during pretrial release," (2) expressed "concerns regarding Ellison's housing situation," and (3) made "comments regarding Ellison's previous noncompliance while out on bail." *Ellison*, ¶¶ 16-17. We reasoned that the prosecutor's comments were appropriate because they were made "in response to Ellison's argument seeking accommodations for her medical condition" in relation to her probationary drug monitoring requirement. *Ellison*, ¶ 19. In *Bartosh*, we determined that a prosecutor did not undermine a plea agreement when he called a witness to testify to Bartosh's noncompliance with a treatment plan because "[o]nce Bartosh testified as to his conduct concerning compliance . . . , the State was justified in presenting" the witness's contradictory testimony. *Bartosh*, ¶ 22. We also determined that the prosecutor's statement that "the State [was] not happy with the way the Defendant ha[d] answered the questions in the PSI" did not "raise a question concerning the fundamental fairness of the trial court proceeding" in the context of his statement that he still "would recommend" the agreed upon sentence. *Bartosh*, ¶ 23.

¶44 The prosecutor's comments in this case were appropriate responses to Brady's arguments at sentencing, the entire theme of which was a full-throated extension of his statements in the PSI demonstrating a complete lack of remorse for his actions. From my review of the record, I have no doubt that Brady is sincere in his belief that he is a victim

25

in life; but this does not preclude the prosecutor from rebutting Brady's sincerity with a healthy dose of reality.

¶45    The Court concludes that the prosecutor "paid [the agreement] mere lip service by casting doubt on the recommendation." Opinion, ¶ 25. In that regard, the Court specifically emphasizes the prosecutor's response to Brady's objection that the prosecutor's comments were a breach of the plea agreement, which the Court excerpts as follows:

> I'm asking the Court to follow the plea agreement and *there's times people get a better deal than they're entitled to*. Maybe he is, but I think that the tale will be told over the next three years of his conduct. So the Court should give him a chance to prove that he can take responsibility.

Opinion, ¶ 11 (emphasis in Opinion). Since this was the prosecutor's final word on this matter, and it was specifically in response to Brady's objection, I agree it is an important statement to consider in our determination as to whether or not the prosecutor was trying to undermine the plea agreement. But as we have recognized before in these situations, context—and in this case italics—is everything. It is difficult to discern a statement's intent from a cold record. It's like a Rorschach test where we naturally place our own inflection and emphasis on certain words. The Court zeroes in on the clause, "there's times people get a better deal than they're entitled to," and concludes that the prosecutor breached the plea agreement. But it is obvious from the record—as the Court itself recognizes—that the District Court was *already* thinking Brady was getting a better deal than he was entitled to. This was apparent from the District Court's expressed concerns about Brady's complete lack of remorse and victim blaming in the PSI, which Brady only doubled down on during

26

the sentencing hearing. So there was no advantage to the prosector making that statement, other than to acknowledge the District Court's already existing concerns and addressing those concerns by noting that even if "maybe" Brady was getting a better deal than he was entitled to:

> the tale will be told over the next three years of his conduct. *So the Court should give him a chance to prove that he can take responsibility.*

(Emphasis added.) This was the prosecutor's final word on the matter.

¶46 Brady seeks specific performance of the plea agreement. But Brady's idea of specific performance is that he should be allowed to portray himself at sentencing as a misunderstood cross between John Dutton and St. Thomas Aquinas while the prosecutor sits idly by and quietly nods. That is not what our precedents require and it is not what I would require of the prosecutor in this case.

¶47 The prosecutor reasonably responded to Brady's statements in his PSI and at sentencing that, as the District Court aptly observed, were "about as devoid of remorse as a person could be," and "blamed this whole incident on everyone else but him[self] and . . . cast[] himself as the victim . . . acting in self-defense." I would hold that the prosecutor did not breach the plea agreement and I dissent from the Court's conclusion that he did. I concur with the Court's holdings that a district court does not have unilateral authority, pursuant to §§ 46-18-201(4)(p) or -202(1)(g), MCA, to restrict a defendant's right to seek early termination of a sentence under § 46-18-208, MCA, but that a defendant may agree in a plea agreement to waive or restrict the right to seek early termination of a deferred or suspended sentence.

27

/S/ JAMES JEREMIAH SHEA

Justice Beth Baker joins in the dissenting and concurring Opinion of Justice James Jeremiah Shea.

/S/ BETH BAKER

28